# Illinois Official Reports

## Appellate Court

---

### *People v. Woods*, 2020 IL App (1st) 163031

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROSCOE WOODS, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>No. 1-16-3031 |
| Filed | July 31, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-1130; the Hon. Stanley J. Sacks, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; remanded with directions. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, and Elena B. Penick, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Annette Collins, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Presiding Justice Mikva and Justice Cunningham concurred in the judgment and opinion. |

**OPINION**

¶ 1        Defendant, Roscoe Woods, appeals the order of the circuit court denying him leave to file a successive postconviction petition. On appeal, defendant contends that this court should remand for second-stage proceedings, where (1) an attached affidavit sufficiently supported his claim of actual innocence by stating that the affiant pointed a gun at defendant causing defendant to discharge his firearm in self-defense and (2) the mandatory 25-year firearm enhancement resulted in a sentence that violated the proportionate penalties clause of the Illinois Constitution. For the following reasons, we affirm the court's denial as to defendant's proportionate penalties claim. However, we reverse the denial as to defendant's actual innocence claim and remand for second-stage proceedings.

¶ 2                                                    I. JURISDICTION

¶ 3        Defendant prematurely filed his notice of appeal on October 4, 2016. On July 26, 2018, the supreme court entered a supervisory order allowing defendant to file a late notice of appeal. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 651(a) (eff. July 1, 2017), governing appeals in postconviction proceedings.

¶ 4                                                    II. BACKGROUND

¶ 5        On December 11, 2006, Chicago police officer Lee Trevino was shot and injured on Division Street in Chicago, Illinois, after responding to a disturbance at nearby Clemente High School. On the first day of defendant's trial, the State filed a motion *in limine* seeking to introduce evidence that on the day of the shooting, at approximately 8 a.m., defendant approached Terrell Durham in the same general area of the incident. Durham would testify that defendant had a silver-colored pistol in his waistband and said, "What you be about Cobra." Durham responded that he was not a Cobra but a member of a different gang. Defendant then walked away saying he did not have a problem with Durham. The State argued that this other-crimes evidence was relevant to establish defendant's intent and motive in firing the gun, as well as his state of mind. The State also argued that this evidence was relevant to negate the defenses of an innocent frame of mind, mistake, necessity, and self-defense.

¶ 6        Defense counsel argued that the incident was prejudicial and not relevant. Specifically, counsel stressed that the shooting was a separate incident that occurred at a different time of day and the evidence was prejudicial because the jury could infer that defendant was predisposed to violence on the day of the shooting. In ruling on the motion, the trial court barred the evidence as inadmissible in the State's case-in-chief. The court, however, pointed out that defendant had raised the affirmative defenses of self-defense and necessity. The trial court cautioned that the other-crimes evidence may be admissible in rebuttal if defendant opened the door "depending on what the defense offers or brings out on his examination of the witnesses."

¶ 7        At trial, Officer Michael Komo testified that, at about 2:30 p.m. on the day of the shooting, he was assigned to a disturbance at the Division Street and Western Avenue bus stop near Clemente High School. He testified that he and Officer Trevino were in uniform and drove a marked police car to the area near the bus stop. He stated that the Spanish Cobras and the

Maniac Latin Disciples were the primary gangs operating in the area. The two gangs "don't get along," and he saw Spanish Cobra gang signs being "thrown up." Officer Komo observed six kids fighting and then running westbound on Division Street past the marked police car. The kids continued fighting, shoving each other, "throwing up gang signs," and shouting gang words at each other. There were about 30 other people on the street at the time.

¶ 8    The officers approached, and when he was 15 to 20 feet from the fight, Officer Komo identified himself as a Chicago police officer and shouted "get out of here, break it up" while waving his baton. He identified defendant as one of the kids fighting and testified that defendant was wearing a thigh-length coat with fur around the collar. When he shouted for the crowd to disperse, the kids involved in the fight looked at him and started to run. Defendant was running away from him on Division Street. As defendant passed Campbell Avenue, he turned around, reached in his waistband, and produced a gun. Facing Officer Komo, defendant fired five or six shots in the officers' direction. Officer Trevino, who was hit in the arm, shouted "I'm hit." Both officers took cover behind a parked car. After the shooting, Officer Komo observed spent cartridges on the ground where defendant had fired his gun.

¶ 9    Danate Barnes testified that he was in the area when the fight occurred. He stated that defendant, whom he knew as "Nu-Nu," was a member of the Maniac Latin Disciples gang. Barnes did not know defendant's real name. He testified that defendant and another Maniac Latin Disciples gang member, "Buckaroo," walked past members of the Spanish Cobras gang and they began verbally insulting each other. Defendant and Buckaroo walked away from the Spanish Cobras, but the Spanish Cobras followed them. At some point, the altercation turned physical, and Barnes ran away because he heard gunshots.

¶ 10    Kenyon Taylor testified that, on the day of the incident, he was at his girlfriend's house approximately four blocks from Clemente High School. Taylor knew defendant because he was friends with defendant's cousin. He testified that both defendant and defendant's cousin were members of the Maniac Latin Disciples gang. On the day of the incident, defendant came to the house and rang the doorbell. Defendant was wearing a black coat with fur on it, and he looked "rough," "scared," and "nervous." Defendant told Taylor that he was "in a jam" and he might have shot a police officer. He asked Taylor to stash a black handgun for him, but Taylor refused.

¶ 11    The State also called Torrey Davis, who had previously given a written statement to the police and had testified before a grand jury. At trial, Davis identified defendant, whom he knew as both Roscoe Woods and "Nu-Nu." He testified that he did not know if defendant was a member of the Maniac Latin Disciples gang. On the day of the incident, Davis saw a Hispanic man fighting with an African-American man, and they were the only two people fighting in the street. He testified he also saw a Hispanic man with a silver gun in the alley. The man with the silver gun had a mask over his face. Davis denied seeing defendant fighting, running, or shooting.

¶ 12    Assistant State's Attorney (ASA) Susan Jakubiak read into evidence Torrey Davis's written statement, which he had provided a few days after the shooting. Davis was 14 years old at the time of the incident, and although he socialized with the Maniac Latin Disciples gang, he was not actually in the gang. Davis knew defendant as "Nu-Nu" and knew that he was a member of the Maniac Latin Disciples gang. Davis stated that at the time of the incident, he saw defendant with "Buckaroo, G-Money, and Little Feasy." Davis was walking with the group when a Spanish Cobra gang member came up to them and asked if they were Maniac

Latin Disciples. The Spanish Cobra then took off his shirt and curled his index finger to appear as though he was pulling the trigger of a gun. Davis did not actually see a gun, but he believed that the Spanish Cobra was signaling for someone to bring him a gun. Six other Spanish Cobras joined the original Spanish Cobra, and Davis, along with defendant, Buckaroo, G-Money, and Little Feasy, began to run. More Spanish Cobras appeared, and defendant pulled a black gun out of his waistband. When defendant held the gun like he was going to shoot, Davis told him not to shoot because there was a little girl present. Defendant put the gun in his pocket. The group ran about four more steps when Buckaroo said to defendant, "Why are you running, don't you got the banger?" Defendant then pulled the gun out of his pocket, stopped, and turned around. Davis heard five or six shots coming from defendant's direction. ASA Jakubiak testified that, at the time he gave his statement, Davis never told her about a Hispanic gentleman on the street with a silver handgun. ASA Sabra Ebersole testified regarding Davis's testimony before the grand jury, which was substantially similar to the written statement he provided to ASA Jakubiak. ASA Ebersole testified that Davis never told her about a Hispanic man with a silver gun.

¶ 13 Officer Trevino testified as the State's final witness. His testimony was substantially similar to Officer Komo's regarding their drive to the scene of the fight, the number of people fighting, and the location of the fight. He testified that, during the incident, his attention was focused on a Hispanic man who had his shirt off and was flashing gang signs. He then heard five or six shots fired in front of him in quick succession. He did not see who fired the shots. After he was hit by one of the shots, he and Officer Komo retreated for cover behind a parked car.

¶ 14 Defendant, who was 17 years old at the time of the incident, testified on his own behalf. He stated that, at approximately 2:30 p.m. on the day of the incident, he got off the bus at the intersection of Division Street and Western Avenue to go to his grandmother's house, which was three or four blocks from the bus stop. As he got off the bus, a crowd of people asked him if he was a Maniac Latin Disciple. He answered that he was not a Maniac Latin Disciple and kept walking. Defendant testified that one of the people in the crowd accused him of being a Maniac Latin Disciple because his cousin was a member of the gang. He knew of them, but he was not a member of the gang. Defendant's cousin was killed a month earlier on his grandmother's porch.

¶ 15 His cousin's friends, Little Feasy, G-Money, and Buckaroo, were standing by the bus stop, and they told defendant they would walk with him for safety. As defendant's group walked, another group approached from the front and said, "y'all Maniacs." Defendant testified that Little Feasy replied and a fight ensued. Defendant continued walking until some Hispanic men stopped him. One of the men signaled for a gun before running away.

¶ 16 Defendant then saw a man come out of the alley, running toward him with a silver gun. Defendant ran, but when the man with the silver gun aimed at him, defendant shot his gun. He testified that, when he shot the gun, his head was facing forward to see where he was running and the gun was behind him. He did not look back or see where his gun was pointed. Defendant testified that he was scared he was going to get shot because his cousin had recently been killed. He denied telling Kenyon Taylor that he may have shot a police officer. He also denied participating in the fight. Instead, he was running away from it. Defendant stated that he was not in the area on the morning of the incident and he did not have any contact with Terrell Durham.

¶ 17    After the defense rested, the State renewed its motion *in limine* to call Durham in rebuttal to negate defendant's claims of self-defense, necessity, and mistake. Defense counsel argued that defendant's testimony was vague regarding whether he was in the area at the time of the incident and that too much time separated the two incidents. The trial court allowed the State to call Durham, reasoning that the evidence was permissible to show defendant's intent and motive and the absence of mistake.

¶ 18    Durham testified that at 8 a.m. on the morning of the incident, defendant, whom he knew as "Sto," said to him, "what you be about Cobra." Durham identified defendant in open court. Defendant showed him a silver-colored pistol on his waist. Durham responded that he was a "G.D.," and defendant responded, "My problem is not his." Durham interpreted this to mean that defendant did not have a problem with him.

¶ 19    The State also called Rosalinda Taufique and Detective Michael Landano in rebuttal. The prosecutor informed the court that the detective was to testify to a conversation he had with defendant at the time of his arrest and that Taufique was going to testify that she saw the shooting. Specifically, her testimony would contradict defendant's testimony as to the position of his body at the time of the shooting.

¶ 20    Defense counsel objected to Taufique's testimony, arguing that it would be cumulative to Officer Komo's testimony, that the State had an opportunity to call Taufique during its case-in-chief, and that her testimony would not specifically rebut defendant's testimony. Defense counsel also argued that the State violated discovery rules by not tendering Taufique's statement regarding the positioning of the shooter to the defense. The State responded that the reports disclosed that Taufique observed a male with a gun discharging the weapon as he ran past her store. The trial court overruled defendant's objection and allowed Taufique to testify.

¶ 21    Taufique testified that, on the day of the incident, she was in her store on Division Street. Looking out her window, she saw people running. One of them stopped, turned, and fired five shots. Taufique indicated that the shooter's left elbow was bent and his right arm was across the left arm. Taufique recalled that the shooter was an African-American male, but she could not see his face. She could not identify the shooter other than the fact that he wore a long black coat. On cross-examination, Taufique stated that in her first interview she did not tell the police the manner in which the shooter shot the gun, but she gave that information during her second interview.

¶ 22    Detective Landano testified that, shortly after defendant's arrest, defendant denied shooting a gun or even having a gun. Defendant never told him that he saw a Hispanic male with a gun.

¶ 23    Following closing arguments, the jury found defendant guilty of attempted murder and aggravated battery with a firearm. The jury also found defendant personally discharged a firearm causing severe bodily injury.

¶ 24    Defendant filed a motion for a new trial pursuant to section 116-1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-1 (West 2008)). Defendant argued that the trial court erred in allowing Rosalinda Taufique to testify as a rebuttal witness because her testimony improperly added evidence that was available for the State to use in its case-in-chief. Defendant also argued that Taufique's testimony severely prejudiced him and denied him a fair trial. The trial court denied defendant's motion.

¶ 25    At defendant's sentencing, he expressed remorse for his actions. The State presented a victim impact statement from Officer Trevino, which stated: "I hope [defendant's] stay in

prison will change [him], and this change, either good or bad, will rest solely on his shoulders." The court acknowledged the officer's statement that defendant should "give [himself] a chance" when he gets out and "[h]opefully, he'll change for the better." The court noted that defendant was "[s]eventeen years old, really no record of any significance. *** But the law says what the law says." The court stated that defendant fired a gun, causing serious injury to another, and he must face the consequences of his actions. The trial court sentenced defendant to 33 years' imprisonment for attempted first degree murder, which included a mandatory 25-year firearm enhancement.

¶ 26    Defendant appealed, arguing that (1) the trial court allowed the State to introduce improper evidence in rebuttal, (2) the prosecutor's closing remarks distorted the burden of proof and improperly argued the credibility of a police officer as a witness, (3) the trial court violated Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) during *voir dire*, and (4) defendant was entitled to seven additional days of presentence credit. This court affirmed defendant's conviction and sentence but ordered the mittimus corrected. *People v. Woods*, 2011 IL App (1st) 091959.

¶ 27    On September 7, 2012, defendant filed a *pro se* postconviction petition in which he alleged, *inter alia*, that his trial attorney was ineffective for failing to present a surveillance video that would have corroborated his self-defense claim. Defendant alleged that the video showed

> "an unidentified individual wearing a black skull cap, black hoodie and some blue jeans come running out of an alley on Campbell Street toward the intersection of Campbell and Division Avenue with a gun in his hand, pointed towards a group of people who are standing in the middle of the street at the intersection of Campbell and Division."

¶ 28    Defendant attached correspondence between him and his previous appellate attorney. In one letter, dated October 2010, appellate counsel informed defendant that trial counsel believed the video supported the State's version of the events. In May 2011, appellate counsel stated that trial counsel had provided her with the video but, because it was not presented at trial, it could not be used on direct appeal. In October 2011, appellate counsel informed defendant, that although she had the video, she could not prepare an affidavit regarding its contents because she had no personal knowledge of the events depicted on the video. Appellate counsel indicated, however, that defendant could prepare an affidavit as to its contents or have a family member set up a time to view the video. Defendant also attached a statement from Adrian Gomez, who stated that he saw a masked man firing a silver pistol at the crowd and he viewed the surveillance video while in custody and saw the masked man on the video. Gomez explained in his statement that he was incarcerated and could not get his signature notarized.

¶ 29    The circuit court dismissed defendant's petition as frivolous and patently without merit. The court noted that defendant had not attached the actual video even though his appellate counsel could have provided him with a copy. Nevertheless, the court found that the unrebutted record showed that trial counsel's decision not to present the video was strategy because he believed the tape "tended to corroborate the State's version of what happened on the day of the shooting." The court also concluded that the video would have been cumulative to the evidence presented at trial because defendant and Davis testified that they saw a man come out of the alley holding a silver gun. This court affirmed the summary dismissal, finding that defendant failed to comply with the postconviction statute's evidentiary requirement regarding the surveillance video or provide an explanation for why he did not do so. *People v. Woods*, 2015 IL App (1st) 130131-U.

¶ 30 On April 2, 2016, defendant filed a motion for leave to file a successive postconviction petition. Defendant's successive petition alleged (1) ineffective assistance of trial counsel, (2) actual innocence where he shot his gun in self-defense, (3) that his sentence of 33 years' imprisonment violated the proportionate penalties clause of the Illinois Constitution because he was 17 years old when the incident occurred and the mandatory firearm enhancement of 25 years removed discretion from the trial court in imposing his sentence, (4) ineffective assistance of appellate counsel, and (5) that his sentence was unconstitutional and void.[1]

¶ 31 Defendant attached an affidavit in which he stated that, on the day of the incident, he found himself in the middle of a gang conflict as he was walking to his grandmother's house. Several members of the Spanish Cobras started chasing defendant, but he slowed down once he reached the intersection of Campbell Avenue and Division Street because he wanted to make sure his cousin and friends were all right and he "wasn't being chased anymore." While defendant waited, he

> "noticed 'an individual (who is now known as Hector Torres) come running out of the alley on Campbell Street with his right arm extended in front of his body pointing a gun at me and the crowd of people who are standing at the intersection of Campbell and Division Avenue.' This all can be seen on the video footage which was shown to me by trial counsel several times."

¶ 32 Defendant's successive petition also included a signed and notarized affidavit from Hector Torres. Torres admitted that he was the "Hispanic guy" who came out of the alley and pointed a gun at defendant, causing defendant to shoot in self-defense.

¶ 33 In his affidavit, Torres stated that he was a member of the Spanish Cobras and was in the area at the time of the shooting. He participated in a fight between other Spanish Cobras and defendant and the Maniac Latin Disciples. Torres's statement continued:

> "So when I seen [defendant] and the other individuals, I feared they were coming for retaliation because the Maniacs and Cobras don't get along and it was suspected that the Cobras had killed [defendant's] cousin. So I ran to a nearby alley on Campbell that's a few feet away from the intersection of Campbell and Division to retrieve one of the firearm [*sic*] we (Spanish Cobras) had hidden in this alley and as I was coming out of the alley that's when I seen [defendant] and the other individuals standing at the intersection of Division and Campbell still watching the fight which I then ran towards them aiming a silver .38 handgun trying to scare them off the scene and that's when I seen [defendant] running away firing shots simultaneously behind him."

Torres stated that he was "placed under arrest and interrogated for the shooting of Chicago Police Officer Lee Trevino *** and [he] wasn't complying." He was then shown a video by police which depicted him "running toward a crowd of people with a firearm in my hand aimed at [defendant] and several other individuals ***which I then waived [*sic*] my weapon pointing at [defendant] and the other individuals trying to scare them away." Torres claimed that he was beaten by Chicago police and forced to provide a prior written statement identifying defendant as the shooter. As he stated in his affidavit:

---

[1]In his opening brief, defendant raises issues regarding his actual innocence and proportionate penalties claims. Therefore, those are the only issues we will address in this appeal. See *Vancura v. Katris*, 238 Ill. 2d 352, 369 (2010) (finding that "the failure to argue a point in the appellant's opening brief results in forfeiture of the issue").

"I was told by the police that they knew who was doing the shooting and they had two to three people pointing the finger at [defendant] and suggested I do the same because if I didn't comply they were going to charge me so I signed a written statement against [defendant] saying he was the shooter and shot the police. But deep down inside I knew [defendant] only fired his weapon do [*sic*] to my actions that day."

In his petition, defendant stated that, although Torres was listed as a witness on the State's discovery answer, Torres was never presented as a witness for the State. Defendant did not discover the identity of the person who pointed a gun at him until 2014 when "while incarcerated Mr. Torres sent [him] this affidavit." Prior to receiving Torres's affidavit, defendant could not know that Torres would acknowledge that defendant fired his gun because of Torres's actions.

¶ 34    Defendant attached a February 10, 2015, letter from former appellate counsel Elena B. Penick, who mentioned the surveillance video and indicated that she had a copy, which she offered to let defendant's family view, but "no one ever came to do that." She stated that she would give the video to defendant's parents (or anyone defendant requests) to support his postconviction claims.

¶ 35    The circuit court denied defendant leave to file a successive petition. The court found that Torres's affidavit was insufficient to support defendant's claim of actual innocence because "this evidence tends to inculpate petitioner [insofar as] Torres states that he observed [defendant] firing shots on the day in question [and] at best, this affidavit challenges the sufficiency of the evidence presented at trial with regard to [defendant's] affirmative defense, but such a claim is not cognizable" as actual innocence. The circuit court noted that defendant had submitted a CD-ROM, which he alleged contained the surveillance video corroborating Torres's statements in his affidavit. The court "made multiple attempts to view the video footage *** using different devices and software" but "was unable to locate any usable data on the disc, so the purported evidence cannot be considered." However, the court found that, even if the video supported defendant's claim of actual innocence, it was not newly discovered.

¶ 36    The court further found that defendant failed to show cause and prejudice as to his proportionate penalties claim because the case on which it is based, *Miller v. Alabama*, 567 U.S. 460 (2012), was decided prior to filing his first postconviction petition, and *Miller* applied only to juvenile defendants who received mandatory life sentences. Additionally, section 5-4.5-105 of the Unified Code of Corrections (730 ILCS 5/5-4.5-105 (West 2016)), which rendered the firearm enhancement discretionary in sentencing juveniles, applied only to offenses occurring on or after January 1, 2016. Defendant filed this appeal.

¶ 37                                   III. ANALYSIS

¶ 38    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)), provides a procedure through which a defendant may attack his conviction by asserting that it resulted from a "substantial denial" of his or her constitutional rights. A postconviction petition is not an appeal from the conviction judgment; rather, it is a collateral attack on the trial court proceedings. *People v. Tate*, 2012 IL 112214, ¶ 8. "Thus, issues raised and decided on direct appeal are barred by *res judicata*, and issues that could have been raised but were not are forfeited." *Id.*

¶ 39    The Act contemplates the filing of one postconviction petition. *People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002). Therefore, successive petitions are generally disfavored by the

courts, and defendant must obtain leave of court to file a successive postconviction petition. *People v. Sutherland*, 2013 IL App (1st) 113072, ¶ 16. In considering a successive petition, the circuit court determines whether it (1) states a colorable claim of actual innocence or (2) establishes cause and prejudice. *People v. Edwards*, 2012 IL 111711, ¶¶ 22-23, 28. We review the circuit court's determination *de novo*. *People v. Warren*, 2016 IL App (1st) 090884-C, ¶¶ 74-75.

¶ 40    Defendant first contends that the circuit court should have granted him leave to file his successive petition where his claim of actual innocence, based on a theory of self-defense, was supported by Torres's affidavit. Leave to file a successive petition should be granted if the petition and supporting documents raise the probability that "it is more likely than not that no reasonable juror would have convicted [defendant] in the light of the new evidence." (Internal quotation marks omitted.) *Edwards*, 2012 IL 111711, ¶ 24. The circuit court should deny leave only where, as a matter of law, the petition sets forth no colorable claim of actual innocence. *Id.*

¶ 41    An actual innocence claim does not merely challenge the sufficiency of the State's evidence against defendant. *People v. Collier*, 387 Ill. App. 3d 630, 636 (2008). "Rather, the hallmark of 'actual innocence' means 'total vindication,' or 'exoneration.' " *Id.* (quoting *People v. Savory*, 309 Ill. App. 3d 408, 414-15 (1999)). Section 7-1 of the Criminal Code of 2012 (720 ILCS 5/7-1 (West 2016)), titled "Use of force in defense of person," provides that "[a] person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force." Since "[s]elf-defense is a justifying or exonerating circumstance" under the statute (*People v. Eveans*, 277 Ill. App. 3d 36, 47 (1996)), we find that it may serve as the basis of defendant's actual innocence claim. See *People v. Wingate*, 2015 IL App (5th) 130189, ¶ 35 (recognizing that evidence leading "to the defendant's complete acquittal, on the basis of self-defense," may arguably be considered exonerating "to the extent it could support a claim of actual innocence").

¶ 42    To set forth a claim of actual innocence, defendant must show that the evidence in support of his claim was newly discovered, material and not merely cumulative, and of such a conclusive character that it would probably change the result on retrial. *People v. Jones*, 2017 IL App (1st) 123371, ¶ 43. Newly discovered evidence is evidence that was not available at trial, such that defendant could not have discovered the evidence earlier through due diligence. *People v. Barrow*, 195 Ill. 2d 506, 541 (2001). On this issue, we find *People v. Molstad*, 101 Ill. 2d 128 (1984), instructive. While *Molstad* concerned new evidence in the context of a motion for a new trial, our supreme court's analysis of the issue involved the same factors we must consider in disposing of defendant's actual innocence claim.

¶ 43    In *Molstad*, the defendant was convicted of aggravated battery and criminal damage to property. *Id.* at 130. The evidence at trial showed that, while in the parking lot of a liquor store, Thomas Bonner spotted Michael Patterson in a van and punched Patterson in the face. Bonner dragged Patterson out onto the pavement. They began to fight, and Bonner punched Patterson several times and kicked him in the face. The defendant, who was a bystander, broke up the fight. Patterson vowed revenge as he lay on the pavement. *Id.* at 131.

¶ 44    Around 11:50 p.m. that evening, as Bonner drove with his sister Sandy and his girlfriend Wendy Albritton, several vehicles surrounded Bonner, forcing him to stop. Around 8 to 10 people got out of the vehicles and began attacking Bonner's car with baseball bats and lead

pipes. Sandy screamed and ran to neighboring houses for assistance. Albritton stated that she saw the defendant strike the back window of the car. *Id.* She also observed David Kent, Mike Guerra (actual name Geary), David Kroll, and Mike Schmidt attacking the car. Although Sandy identified several assailants in open court, she did not testify that the defendant was present. *Id.* at 131-32. Bonner was hit in the head with a bat, and he ran away, falling into a ditch. After he fell, he was struck repeatedly with lead pipes and baseball bats. Bonner was hospitalized for six days and sustained multiple bruises and a bone fracture. *Id.* at 132.

¶ 45    The defendant testified that he was not present during the attack. Rather, he returned home between 10 and 10:30 p.m. and went to bed shortly thereafter. His parents corroborated his testimony. The codefendants Albritton identified did not testify at trial. *Id.*

¶ 46    After the defendant was convicted, the trial court denied his motion for a new trial to introduce the exculpatory testimony of codefendants David Kent, David Kroll, Jose Flores, and Mike Schmidt, who were also convicted. The defendant also presented the affidavit of an acquitted codefendant, Edward Kroll. The affidavits stated that the defendant was not present at the time of the attack on Bonner and his automobile. *Id.* at 132-33.

¶ 47    In determining whether the trial court erred in denying the defendant's motion for a new trial, our supreme court noted that new evidence warrants a new trial if it is of such conclusive character that it will probably change the result on retrial, it is material to the issue and not merely cumulative, and it could not have been discovered prior to trial through due diligence. *Id.* at 134. It was undisputed that the affidavits were prepared after the jury reached its verdict. Also, these codefendants did not testify as to the whereabouts of the defendant at trial because such testimony would have been incriminating. The court concluded that the testimony of these codefendants "clearly qualifies as newly discovered evidence." *Id.* at 134-35. The court found that "no amount of diligence could have forced the codefendants to violate their fifth amendment right to avoid self-incrimination [citation] if the codefendants did not choose to do so." *Id.* at 135.

¶ 48    The court also disagreed with the State's argument that the affidavits merely amounted to cumulative evidence. The court acknowledged that the defendant presented alibi evidence at trial. However, since the codefendants' statements directly addressed the ultimate issue of whether the defendant was present during the attack, the affidavits raised "additional questions concerning" the verdict and were not cumulative. *Id.* The court further found that a different result is probable if the trial court considers the codefendants' affidavits. Given Albritton's testimony that the defendant was present during the attack and the defendant's contrary testimony and that of his parents that he was at home at the time, the codefendants' testimony should cause the factfinder to scrutinize the facts and surrounding circumstances "more closely to determine the guilt or innocence" of the defendant. *Id.* at 135-36. Accordingly, the court concluded that the defendant met the requirements for a new trial. *Id.* at 136.

¶ 49    As in *Molstad*, the new evidence here consists of an affidavit from a person who participated in the incident and had personal knowledge of what occurred. In his affidavit, Torres admitted that he was the person who came out of an alley waving a gun during the fight and that defendant fired his gun due to Torres's actions that day. The State argues that Torres's affidavit does not qualify as newly discovered evidence because defendant was aware of Torres at the time of trial. Torres was listed in police reports as a potential witness, and he provided a statement to police after the incident naming defendant as the shooter.

¶ 50 Torres, however, did not testify at trial, nor did he provide the information in his affidavit to anyone prior to 2014. He stated in his affidavit that he was interrogated by police after the incident and he "wasn't complying." Torres's earlier reluctance to divulge his degree of participation in the fight is not surprising, and like our supreme court found in *Molstad*, no amount of diligence could have forced Torres to admit he had a gun during a shooting investigation if he chose not to do so. Defendant could not know Torres was the person he saw with a gun until he received Torres's affidavit in 2014, well after his direct appeal and two years after he filed his first postconviction petition. We find that Torres's statements qualify as newly discovered evidence.

¶ 51 We also find that Torres's statements are material and not merely cumulative to testimony presented at trial. "Evidence is considered cumulative when it adds nothing to what was already before the jury." *People v. Ortiz*, 235 Ill. 2d 319, 335 (2009). Defendant and Davis did testify at trial about a man with a gun in the alley. However, Torres's statements serve as more than mere corroboration of that testimony. They provide a first-person account of the incident that directly contradicts the trial testimony of the State's primary eyewitnesses, Officers Komo and Trevino. Evidence is not cumulative if it adds to the information that was before the jury and raises additional questions concerning the jury's verdict. *Id.* at 335-36; *Molstad*, 101 Ill. 2d at 135.

¶ 52 Nonetheless, the State argues that defendant's actual innocence claim must fail because Torres's statements are not of such conclusive character that the result on retrial would probably change. We disagree. Officer Komo and Officer Trevino testified that they did not see anyone else with a weapon before defendant fired his gun. The other eyewitness for the State, Davis, testified that he saw a Hispanic man with a silver gun in the alley prior to the shooting, which corroborated defendant's testimony. The State, however, read into evidence Davis's prior statements in which he said nothing about a man with a gun, calling into question Davis's credibility. No witness for the defense testified about the information presented by Torres's affidavit.

¶ 53 Defendant has consistently maintained that there was a man in the alley pointing a gun at him before he fired his shots, but prior to Torres's affidavit no unimpeached evidence corroborated his account. Torres now admits that he was the man who waved his gun at defendant, causing him to shoot. Torres's intent in waving his gun was to scare people at the scene. We are mindful that, at this stage, we take as true all well-pleaded factual allegations in the petition and supporting documents unless they are positively rebutted by the record. *People v. Sanders*, 2016 IL 118123, ¶ 48. With the factfinder charged with ascertaining the credibility of the witnesses and resolving conflicting accounts, this new evidence raises the probability that the jury would find defendant acted in self-defense. See *People v. Henderson*, 2014 IL App (2d) 121219, ¶ 35. For the reasons set forth, we find that defendant's petition and supporting documents presented a colorable claim of actual innocence and the circuit court erred in denying him leave to file his successive petition on this basis.

¶ 54 Defendant also contends that his successive petition sufficiently established cause and prejudice regarding his claim that the mandatory 25-year firearm enhancement, as applied to him, resulted in a sentence that violated the proportionate penalties clause. Leave of court to file a successive postconviction petition may be granted if defendant shows cause for failure to raise the claim in the initial postconviction proceeding and prejudice resulting therefrom. 725 ILCS 5/122-1(f) (West 2016); *People v. Wrice*, 2012 IL 111860, ¶ 48. The State's brief

challenges only prejudice; therefore we address only that element of the analysis. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("[p]oints not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing"). Prejudice is shown if the failure to raise the claim earlier "so infected the entire trial that the resulting conviction or sentence violates due process." *Pitsonbarger*, 205 Ill. 2d at 464.

¶ 55       The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A sentence violates the proportionate penalties clause if it is "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002). Our supreme court has never defined what constitutes a cruel or degrading sentence that is " 'wholly disproportioned to the offense' " because "as our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community." *Id.* at 339. To determine whether a sentence shocks the moral sense of the community, a reviewing court considers the objective facts of the case in light of "the community's changing standard of moral decency." *People v. Hernandez*, 382 Ill. App. 3d 726, 727 (2008).

¶ 56       We know that courts unequivocally distinguish juvenile defendants from adults when imposing life sentences. See *Miller v. Alabama*, 567 U.S. 460 (2012); *People v. Miller*, 202 Ill. 2d 328 (2002). These cases recognized that children lack maturity and have an underdeveloped sense of responsibility, are more vulnerable to negative influences, and have character that is not yet well formed. *Miller*, 567 U.S. at 471. Thus, *Miller* held that "a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders" violates the eighth amendment because such a scheme, by making the factors of youth "irrelevant to imposition of that harshest prison sentence, *** poses too great a risk of disproportionate punishment." *Id.* at 479. In *People v. Buffer*, 2019 IL 122327, our supreme court extended the constitutional protections set forth in *Miller* to juvenile defendants sentenced to more than 40 years in prison, finding that a sentence of 40 years or less provides a meaningful opportunity to demonstrate maturity and rehabilitation and obtain release. *Id.* ¶ 41.

¶ 57       Defendant's sentence of 33 years' imprisonment is not a mandatory life sentence, nor is it a sentence of more than 40 years that our supreme court has determined constitutes a *de facto* life sentence. As such, defendant's sentence does not raise the constitutional concerns expressed in *Miller* and *Buffer*. See also *People v. Patterson*, 2014 IL 115102, ¶ 110 (concluding that "[a] prison term totalling 36 years for a juvenile who personally committed three counts of aggravated criminal sexual assault does not fall into that category" of "the most severe of all criminal penalties"). Defendant's sentence, however, did include a mandatory 25-year enhancement because in committing the offense of attempted murder, he "personally discharged a firearm that proximately caused great bodily harm, *** or death to another person." 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2010). Defendant, who was 17 years old when he committed the offense, argues that the mandatory firearm enhancement violated the proportionate penalties clause as applied to him because it "did not permit the court to give appropriate weight to his youth and rehabilitative potential."

¶ 58       Our supreme court has clearly upheld the constitutionality of mandatory firearm enhancement provisions. The court determined that these provisions do not violate the proportionate penalties clause because the legislature's purpose in enacting them, to account

for the added danger when an offender uses a firearm in committing a felony, does not "shock the conscience of the community." *People v. Sharpe*, 216 Ill. 2d 481, 524-25 (2005). The court reasoned that, in fixing a penalty for an offense, the potential for rehabilitation need not be given greater weight than the seriousness of the offense. *Id.* at 525. While the case before it concerned first degree murder, our supreme court noted that in the past it found that application of the firearm enhancements to defendants convicted of attempted murder was not "cruel nor degrading, nor would it shock the moral sense of the community." *Id.* at 524. Therefore, "it could not possibly be cruel or degrading or a shock to the moral sense of the community to apply the enhancements to first degree murder itself." *Id.*

¶ 59 In *People v. Wilson*, 2016 IL App (1st) 141500, this court cited *Sharpe* and held that application of a 25-year mandatory firearm enhancement to a 17-year-old defendant convicted of attempted murder did not shock the moral sense of the community. *Id.* ¶ 40. While noting that the defendant had no prior convictions, had a supportive family, and felt pressured by peers to shoot the victim, the evidence showed that he "pursued the victim down an alley, raised his firearm, and shot at the victim four times before fleeing." *Id.* ¶¶ 41, 43. This court further found that, although "there were certain mandatory aspects of defendant's sentence, *** the trial court retained wide latitude to fashion a sentence." *Id.* ¶ 43. Therefore, we concluded that defendant's sentence of 31 years' imprisonment did not violate the proportionate penalties clause. *Id.*

¶ 60 Similar to the circumstances in *Wilson*, defendant here admittedly carried a gun to a location near a high school and bus stop where he got involved in a fight, pulled out the weapon while fleeing, and then fired shots with about 30 people in the area. One of the shots hit Officer Trevino, who recovered from his injuries. The trial court acknowledged defendant's youth and his lack of a significant criminal record but found that his actions in firing the gun merited serious consequences. The court exercised its discretion in sentencing defendant, giving him a little more than the minimum of 31 years but not imposing a natural or *de facto* life sentence. Following *Wilson*, we find that defendant's sentence of 33 years' imprisonment, which included a 25-year mandatory firearm enhancement, did not violate the proportionate penalties clause.

¶ 61 Defendant, however, argues that our standard of moral decency is still evolving on this issue. He points to recent legislation enacted by our legislature that authorizes the trial court, in its discretion, to decline imposing any applicable firearm enhancement when sentencing a defendant who is under 18 years old at the time of the offense. See 730 ILCS 5/5-4.5-105(b) (West 2016). He also cites recent appellate court cases finding that application of an adult sentencing scheme that includes a mandatory firearm enhancement, to certain juvenile defendants, violated the proportionate penalties clause. See *People v. Aikens*, 2016 IL App (1st) 133578, ¶¶ 1, 37 (17-year-old defendant's 40-year sentence for attempted murder, which included a 20-year firearm enhancement, "shocks our evolving standard of moral decency" because defendant had no prior criminal history, was described as full of potential and able to rehabilitate, and had a social history that was " 'quite troubling' "); *People v. Barnes*, 2018 IL App (5th) 140378, ¶¶ 25, 29 (finding that the 15-year mandatory firearm enhancement imposed on defendant, who was 17 years old at the time he committed the offense of armed robbery, had no prior criminal history, had rehabilitative potential, and did not harm anyone during the commission of the offense, "shocks our evolving standard of moral decency"). Defendant

argues that this court should find, as did the courts in *Aikens* and *Barnes*, that application of the mandatory firearm enhancement to him violated the proportionate penalties clause.

¶ 62 We acknowledge the recent legislation, but there is no indication the General Assembly found that application of mandatory firearm enhancements to juvenile defendants shocked our sense of moral decency. The new provision did not completely eliminate application of the mandatory firearm enhancements to juvenile defendants, nor did it make the provision retroactive. See *People v. Hunter*, 2017 IL 121306, ¶ 56. Our legislature clearly believed that, for juvenile defendants, mandatory firearm enhancements were appropriate in certain circumstances.

¶ 63 Also, *Aikens* and *Barnes* are distinguishable from the case at bar. In *Barnes*, the defendant's weapon was not actually loaded (*Barnes*, 2018 IL App (5th) 140378, ¶ 25); in *Aikens*, the defendant fired shots, but no one was injured (*Aikens*, 2016 IL App (1st) 133578, ¶ 37). As we recounted above, defendant here got involved in a fight and was running away from the scene when he fired his gun. Defendant was near a high school, and there were around 30 people in the area. One of defendant's shots hit Officer Trevino, but fortunately no one else was injured or killed. Although his sentence of 33 years' imprisonment is lengthy, defendant did not receive a *de facto* life sentence. Defendant's sentence still allows him a meaningful opportunity to demonstrate maturity and rehabilitation and obtain release. See *Buffer*, 2019 IL 122327, ¶ 41. Since defendant's sentence did not violate the proportionate penalties clause, we find that he has not established prejudice as required to file a successive postconviction petition. We affirm the circuit court's denial of leave to file on this basis.

¶ 64                            IV. CONCLUSION

¶ 65 Since we find that defendant has sufficiently established his actual innocence claim, we reverse the judgment of the circuit court denying him leave to file a successive postconviction petition on that basis and remand for appointment of postconviction counsel and second-stage proceedings. However, we affirm the court's denial of leave to file a successive petition regarding his proportionate penalties claim. See *Pitsonbarger*, 205 Ill. 2d at 462 (finding that "the cause-and-prejudice test must be applied to individual claims, not to the petition as a whole").

¶ 66 Affirmed in part and reversed in part; remanded with directions.