2021 IL App (1st) 181178-U

No. 1-18-1178

Order filed March 31, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 13568 |
| | ) | |
| ANTHONY SMITH, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Justice Reyes concurred in the judgment.
Presiding Justice Gordon dissented.

**ORDER**

¶ 1     *Held*:   The summary dismissal of defendant's postconviction petition at the first stage is affirmed because his claim of ineffective assistance of counsel is frivolous and patently without merit where a witness counsel did not call would not have established self-defense, and where defendant's petition does not indicate how Post-Traumatic Stress Disorder impacted his behavior at the time of the incident.

¶ 2     Defendant Anthony Smith appeals the circuit court's summary dismissal of his *pro se*

postconviction petition at the first stage. He contends he raised arguable claims his trial counsel

rendered ineffective assistance by failing to call an eyewitness who would testify the victim had a gun in his hand after defendant shot him, and an expert witness who would explain how Post-Traumatic Stress Disorder (PTSD) affected defendant's mental state at the time of the shooting. We affirm.[1]

¶ 3    Defendant was charged with six counts of first degree murder arising out of the fatal shooting of Hansen Jackson on June 24, 2012. Following a jury trial, defendant was found guilty of one count of first degree murder by personally discharging a firearm that proximately caused Jackson's death, and was sentenced to 63 years' imprisonment. His conviction was affirmed on direct appeal. *People v. Smith*, No. 1-14-3252 (2016) (unpublished summary order under Illinois Supreme Court Rule 23).

¶ 4    Defendant does not contest he shot and killed Jackson. This appeal concerns defendant's claim of ineffective assistance with respect to certain self-defense evidence; thus, we recite only the facts necessary to decide this appeal.

¶ 5    At trial, Chicago police sergeant Jaime Sosa testified he and his partner were on duty, in uniform, and driving a marked police vehicle on June 24, 2012. At approximately 2 a.m., Sosa and his partner approached the intersection of West Chicago Avenue and North Ridgeway Avenue when Sosa heard and saw gunfire to his left; he heard 8 to 10 gunshots total. Sosa saw defendant, whom he identified in court, walking toward the victim and shooting at him from approximately 10 feet away. Sosa saw a "rapid succession of gunfire" and muzzle flashes. Sosa and his partner were approximately 40 feet away from defendant and the victim.

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

¶ 6     Sosa made eye contact with defendant, who ran south on Ridgeway. Sosa saw the victim on the ground; it did not appear anything was in his hands. Sosa and his partner initially pursued defendant in their police vehicle, then Sosa exited the vehicle and pursued him on foot. Sosa saw a black handgun in defendant's right hand during the pursuit. He lost sight of defendant during the pursuit, but other Chicago police units arrived in the area, and Sosa learned defendant had been arrested.

¶ 7     On cross-examination, Sosa testified he only saw one gun at the intersection of Chicago and Ridgeway.

¶ 8     Chicago police officer Joe Posada testified he and his partner, Sosa, were on duty, in uniform, and driving a marked police vehicle on the morning of June 24, 2012. At approximately 2 a.m., Posada heard gunshots as he and Sosa approached the intersection of Chicago and Ridgeway. Posada saw two men at the southeast corner of the intersection, 25 to 30 feet away. Posada saw defendant, whom he identified in court, shoot the other man with a handgun, which defendant held in his right hand, several times from 3 to 4 feet away. Defendant continued to shoot the other man after he fell to the ground.

¶ 9     Defendant made eye contact with Posada, then ran south on Ridgeway, still holding the gun in his hand. Posda activated his lights and sirens and pursued defendant in his police vehicle. During the pursuit, Posada was approximately 20 feet behind defendant, and saw the gun in defendant's hand. Sosa exited the police vehicle, and Posada continued to pursue defendant while driving it. Posada then parked the police vehicle and pursued defendant on foot. Posada followed defendant into a house and arrested him.

¶ 10    Chicago police officer Gutierrez testified he was on duty and driving a marked police vehicle on the morning of June 24, 2012.[2] At approximately 2 a.m., he responded to a call of shots fired near Chicago and Ridgeway. When he arrived, he saw a man lying on the ground, unresponsive. He did not see a gun anywhere near the vicim. Gutierrez recovered a gun from the roof of a garage some distance away from Chicago and Ridgeway and gave the gun to an evidence technician.

¶ 11    On cross-examination, Gutierrez testified that all 10 rounds had been fired from the gun when he recovered it.

¶ 12    Dr. Ponni Arunkumar testified she was employed by the Cook County Medical Examiner's office and performed Jackson's autopsy. She observed 11 gunshot wounds to Jackson's chest, back, right arm, and left hand. Four were entrance wounds to Jackson's back.

¶ 13    Kurt Murray testified he was a forensic scientist at the Illinois State Police Forensic Science Center. He determined that six cartridge cases and three bullets recovered from the scene of the shooting were fired from the gun recovered in connection with this incident.

¶ 14    Defendant moved for a directed verdict, which the court denied.

¶ 15    Defendant testified that, at approximately 5 p.m. on June 11, 2012, he was walking around his car when another car pulled up near him. Jackson was a passenger in that vehicle, and defendant saw "a gun come out the window" and "heard a loud popping sound." Defendant was shot twice in the head and once in the leg. Defendant was taken by ambulance to the hospital, where he underwent surgery to treat the gunshot wounds to his head.

---

[2] Gutierrez did not provide his first name, but the trial court referred to him as male.

¶ 16   On June 24, 2012, defendant was carrying a gun because he was scared of dying, and was scared of Jackson because Jackson had shot him 13 days earlier. At approximately 2 a.m., defendant was walking on Ridgeway and, as he neared Chicago Avenue, he saw Jackson run around the corner. Jackson was "kind of close" to defendant, but defendant was unsure of how many feet away Jackson was. Jackson had something in his hands, and defendant started shooting at him without thinking about what was in Jackson's hands. Defendant fired six bullets at Jackson, then ran away. He threw his gun onto a roof as he was running. Police arrested defendant inside a house.

¶ 17   On cross-examination, defendant testified he "couldn't place what [Jackson] had in his hand" and was unsure what that object looked like, but Jackson's hands were "by his waist." Defendant shot "Jackson because [he] was afraid that he was fixing to take [defendant's] life because he shot at [defendant] on June 11." Defendant did not walk up to Jackson after Jackson fell to the ground, did not stand over Jackson while pointing the gun at him, and did not pull the trigger while Jackson was on the ground. Rather, he fired and ran. He saw Jackson spin around, but did not see him fall to the ground. Defendant acknowledged he "lied to the police" when he was questioned after his arrest.

¶ 18   The court asked defendant if he agreed with trial counsel's decision not to call any other witnesses, and defendant said he did.

¶ 19   The jury found defendant guilty of first degree murder and that he personally discharged the firearm that caused Jackson's death. The trial court sentenced defendant to 38 years in prison and a 25-year firearm enhancement, for a total of 63 years' imprisonment.

¶ 20    On direct appeal, defendant challenged the sufficiency of the evidence, the admission of certain photographs, the State's remarks in closing argument, and his sentence, but did not raise any claims of ineffective assistance. We rejected defendant's arguments and affirmed his conviction, and granted appointed counsel's motion for leave to withdraw under *Anders v. California*, 386 U.S. 738 (1967). *Smith*, No. 1-14-3252 (2016) (unpublished summary order under Illinois Supreme Court Rule 23).

¶ 21    Defendant filed a *pro se* postconviction petition arguing, in relevant part, ineffective assistance of counsel for failing to investigate and call Markeisha Dockery as a witness, and to call an expert witness who would have explained how PTSD impacted defendant's mental state at the time of the offense. Attached to defendant's petition is Dockery's affidavit, which states she heard four to five gunshots at approximately 2 a.m. on June 24, 2012. She saw a man running up Ridgeway pursued by a police vehicle. She ran toward Chicago Avenue and saw Jackson on the ground, and a man named Quinton Bobo standing near him. Dockery saw a black gun in Jackson's hand. Bobo took the gun and then ran away.

¶ 22    Also attached to defendant's petition is his affidavit, which states Illinois Department of Corrections (IDOC) medical records would show he has been diagnosed with "Anxiety Depression and P.T.S.D. symptoms" as a result of the gunshot to his brain, and that he has been unable to obtain those records despite requesting them from IDOC personnel. Defendant's affidavit identifies his doctors and prescription medications by name. He also attached medical records regarding the gunshot to his forehead, and an article about PTSD that appears to be from a publication called "Nursing Made Incredibly Easy." This article discusses diagnostic criteria and treatment methods for PTSD, generally.

¶ 23 The circuit court summarily dismissed defendant's petition at the first stage. It found his claim regarding trial counsel's failure to investigate and call Dockery was procedurally barred because he could have raised it on direct appeal, and that her testimony did not have a reasonable probability of changing the outcome at trial. The circuit court also found defendant's claim regarding PTSD was procedurally barred because he could have raised it on direct appeal, and would not have supported his claim of self-defense at trial anyway.

¶ 24 On appeal, defendant contends the circuit court should not have dismissed his petition at the first stage because it raised arguable claims his trial counsel was ineffective for failing to investigate and call Dockery and call a medical expert witness regarding his PTSD diagnosis, both of which would have supported his claim of self-defense.

¶ 25 "The [Post-Conviction Hearing] Act [725 ILCS 5/122-1 *et seq.* (West 2018)] provides a remedy to a criminal defendant whose federal or state constitutional rights were substantially violated at trial or sentencing." *People v. Dupree*, 2018 IL 122307, ¶ 28. Proceedings under the Act consist of three stages of review. *People v. Johnson*, 2018 IL 122227. ¶ 14.

¶ 26 The circuit court dismissed defendant's petition at the first stage. At the first stage, a defendant's petition must only present the "gist" of a constitutional claim. *People v. Bailey*, 2017 IL 121450, ¶ 18. The circuit court should only dismiss a petition at the first stage if a defendant's claims are " 'frivolous or [are] patently without merit,' " which generally means that the claims have "no arguable basis either in law or in fact." *People v. Boykins*, 2017 IL 121365, ¶ 9. Circuit courts must give *pro se* petitions "a liberal construction" at the first stage, and review them "with a lenient eye, allowing borderline cases to proceed." (Internal quotations and citation

omitted.) *People v. Hodges*, 234 Ill. 2d 1, 16-17 (2009). We review the dismissal of a postconviction petition at the first stage *de novo*. *Boykins*, 2017 IL 121365, ¶ 9.

¶ 27    A criminal defendant has the right to effective assistance of trial counsel. U.S. Const., amend. VI; *Strickland v. Washington*, 466 U.S. 668 (1984). A defendant claiming ineffective assistance must show that counsel's conduct "fell below an objective standard of reasonableness," and the conduct prejudiced the defendant. *Strickland*, 466 U.S at 687-88, 692. To survive first-stage review, a postconviction petition alleging ineffective assistance of counsel must show "(i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *Hodges*, 234 Ill. 2d at 17.

¶ 28    To establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "[I]f it is easier to dispose of an ineffective assistance claim on the ground that it lacks sufficient prejudice, then a court may proceed directly to the second prong and need not determine whether counsel's performance was deficient." *People v. Givens*, 237 Ill. 2d 311, 331 (2010). Lack of prejudice is a proper basis for first-stage dismissal of a postconviction petition. *People v. Gardner*, 2013 IL App (2d) 110598, ¶ 19.

¶ 29    "Decisions concerning which witnesses to call at trial and what evidence to present on defendant's behalf ultimately rest with trial counsel." *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 79. "It is well established that these types of decisions are considered matters of trial strategy and are generally immune from claims of ineffective assistance of counsel." *Id.* However, "attorneys have an obligation to explore all readily available sources of evidence that might benefit

their clients." (Internal quotations and citations omitted.) *People v. Clark*, 2011 IL App (2d) 100188, ¶ 25. Failure to investigate and present available witnesses to corroborate a defense has been found to be ineffective assistance. *Id.*, ¶ 26. "Whether defense counsel was ineffective for failure to investigate is generally determined by the value of the evidence that was not presented and the closeness of the evidence that was presented." *Id.*, ¶ 24.

¶ 30    Defendant first argues his counsel was ineffective for failing to investigate and call Dockery because her testimony would have "increased the credibility of [his] theory of defense." The decision not to call Dockery at trial is presumed to be tactical (*Wilborn*, 2011 IL App (1st) 092802, ¶ 79), and we find defendant has not established he was prejudiced by that decision.

¶ 31    Defendant argued self-defense at trial. To establish self-defense, a defendant must show: (1) force was threatened against a person; (2) the person was not the aggressor; (3) the danger of harm to the person was imminent; (4) the threatened force was unlawful; (5) the person actually and subjectively believed a danger existed, which required the use of the force applied; and (6) his beliefs were objectively reasonable. *People v. Washington*, 2012 IL 110283, ¶ 35. If the State negates any one of these six factors, the claim of self-defense fails. *People v. Martinez*, 2019 IL App (2d) 170793, ¶ 85. The burden of proof remains on the State to prove, along with the elements of first degree murder, the absence of circumstances at the time of the killing that would justify or exonerate the killing under a theory of self-defense. 720 ILCS 5/9-2(c) (West 2012).

¶ 32    Dockery did not see the shooting or what preceded it. Her affidavit only claims that, after hearing gunshots, she ran up to Jackson and saw Bobo take a gun from his hand. Thus, Dockery's testimony suggests Jackson may have had a gun on his person when defendant shot him, and explains why police did not find a gun near Jackson's body. However, it does not establish

defendant saw a gun or knew Jackson was armed, and it does not establish Jackson threatened imminent force against defendant before defendant shot him. Thus, Dockery does not even arguably establish self-defense because she cannot establish the essential elements that unlawful force was threatened against defendant and the danger of harm was imminent. See *Washington*, 2012 IL 110283, ¶ 35.

¶ 33    In addition, Dockery's testimony would not change defendant's admissions that he did not know what was in Jackson's hands, that Jackson did not threaten force against him, and that he began firing at Jackson as soon as he saw Jackson round the corner. The jury found defendant's testimony did not establish self-defense, and we cannot see how Dockery's testimony would have altered that outcome. As such, we cannot say Dockery's testimony has a reasonable probability of changing the outcome of the trial.

¶ 34    Moreover, defendant's theory of self-defense was not based on a claim Jackson threatened him with a gun on June 24, 2012. Rather, defendant's theory was that he feared Jackson because Jackson shot him on June 11, 2012, and began shooting at Jackson without knowing what the object in his hand was. Thus, Dockery's testimony suggests a different theory of self-defense than the one defendant presented at trial; it does not necessarily corroborate defendant's claim of self-defense.

¶ 35    Defendant cites *People v. Bates*, 324 Ill. App. 3d 812 (2010), in which we held the defendant was entitled to a third stage evidentiary hearing on his postconviction petition alleging ineffective assistance for counsel's failure to call a witness who saw a gun near the vicitm's hand after defendant shot him. *Bates*, 324 Ill. App. 3d at 813-14. In *Bates*, the "defendant claimed he shot [the victim] in self-defense after [the victim] threatened him with a gun." *Id.* at 813.

By contrast, here, defendant never claimed Jackson threatened him with a gun, or even that Jackson was armed with a gun. As defendant's brief concedes, his "theory of defense was that he was tramautized when he was shot in the forehead two weeks before the incident, and that he simply reacted when Jackson came running around the corner towards him, believing he was acting in self-defense."

¶ 36    The dissent argues defendant's ineffective assistance allegation with respect to trial counsel not calling Dockery should have survived first-stage review because her testimony Jackson had a gun  "would have supported defendant's testimony that he was scared for his life and his fear was reasonable." *Infra* ¶ 66. We maintain Dockery's testimony could not have established any kind of self-defense, reasonable or unreasonable.

¶ 37    Threat of force is a required element of both reasonable and unreasonable self-defense, *i.e.*, second degree murder. See *Washington*, 2012 IL 110283, ¶ 35; *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 149. Defendant had the burden to prove this element under a theory of complete self-defense or a theory of second degree murder. See *Castellano*, 2015 IL App (1st) 133874, ¶ 149. However, his testimony did not establish this element, and Dockery's testimony would not have established it either. Her affidavit does not claim Jackson threatened force against defendant; rather, it is silent as to what happened before defendant shot Jackson. Thus, Dockery's testimony could not have changed the jury's decision not to find any form of self-defense, including second degree murder. Her absence at trial did not prejudice defendant under *Strickland* because she could not have changed the outcome of trial. See *Strickland*, 466 U.S. at 694.

¶ 38    Defendant next argues counsel was ineffective for failing to call an expert medical witness to explain how PTSD caused him to act in self-defense. We find defendant has failed to establish prejudice with respect to this issue as well.

¶ 39    We take as true defendant's claim he was diagnosed with PTSD in prison. See *People v. Robinson*, 2020 IL 123849, ¶ 45 ("At the pleading stage of postconviction proceedings, all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true."). Defendant's explanation as to why he has been unable to obtain IDOC medical records that reflect his PTSD diagnosis is proper under the Act. See 725 ILCS 5/122-2 (West 2018) (a petitioner shall explain why evidence supporting his allegations is not attached to his petition).

¶ 40    However, defendant's petition does not include an affidavit from a medical expert witness explaining how defendant's PTSD diagnosis relates to his claim of self-defense. In the absence of such an affidavit, defendant cannot show a reasonable probability the result of trial would have been different, because there is no proof defendant's post-incident PTSD diagnosis impacted his mental state at the time of the incident. See *Dupree*, 2018 IL 122307, ¶ 40. Defendant's petition only establishes he was diagnosed with PTSD in prison. It does not establish he had PTSD at the time of this incident or, more importantly, how PTSD impacted his behavior during this incident. Thus, defendant has not established his counsel's decision not to call a medical expert to discuss defendant's PTSD diagnosis prejudiced him.

¶ 41    Defendant argues "[t]here is at least a reasonable probability that the jury would have found [him] guilty of second degree murder, rather than first degree, had it been presented with evidence that [he] suffered PTSD which may have led him to believe that self-defense was necessary when

Jackson came running towards him." But defendant does not explain why. Nothing in the record indicates why PTSD might have caused defendant to believe, reasonably or unreasonably, he needed to shoot Jackson to defend himself. The article attached to his petition provides a general synopsis of PTSD, but it offers no evidence as to how PTSD affected defendant specifically. Defendant has not established what, if any, impact PTSD had on his behavior when he shot and killed Jackson. Thus, he cannot establish counsel's decision not to present evidence about his PTSD diagnosis prejudiced him.

¶ 42    The dissent argues defendant's petition should have survived first-stage review because defendant being shot in the head two weeks before this incident necessarily "affected his mental state" and "could cause mental anguish and emotional distress to the average person." *Infra* ¶¶ 49, 58. We agree that being shot likely affected defendant's mental state.

¶ 43    However, defendant's petition does not allege "his trial counsel was ineffective for failing "to support or prove his self-defense claims" generally, as the dissent states. *Infra* ¶ 54. Defendant specifically claims his trial counsel was ineffective for failing to call an "expert-witness '(Neuropsychologist)' " to explain how "Post-Concussive Disorders for Traumatic Brian Injury Victims" impacted his mental state when he shot Jackson. Defendant's petition contains no evidence, or even allegations, about what any doctor would say as to this issue. We do not affirm the dismissal of defendant's petition solely because he did not include an affidavit from a proposed expert witness, as the dissent suggests. Rather, defendant's petition simply does not explain how expert witness testimony might have changed the outcome of trial, particularly when defendant argued self-defense. A defendant's mental health issues are not an element of any theory of self-defense. *Washington*, 2012 IL 110283, ¶ 35; *Castellano*, 2015 IL App (1st) 133874, ¶ 149.

¶ 44    More importantly, there is no evidence trial counsel knew or should have known of defendant's mental health issues that were first diagnosed after trial. The June 2012 medical records attached to defendant's petition do not reflect any mental health diagnoses, or even symptoms. Defendant does not claim he told trial counsel about any mental health symptoms he experienced or treatment he received. Defendant's Presentence Investigation Report (PSI) indicates he denied "any current or past mental health issues that would war[rant] him to receive mental health treatment." The only medical records that would reflect defendant's mental health issues are in the custody of Stateville Correctional Center. Thus, it appears defendant was diagnosed with anxiety, depression, and PTSD in prison, only *after* he was convicted. We accept this as true.

¶ 45    However, it is frivolous to claim trial counsel was ineffective for failing to call an expert witness to testify about diagnoses that apparently did not exist at the time of trial. See *People v. Henderson*, 171 Ill. 2d 124, 143 (1996) ("Defendant's trial counsel therefore cannot be faulted for failing to present a medical record which did not exist at the time of the [suppression] hearing."); *People v. Williams*, 2017 IL App (1st) 152021, ¶ 38 ("Where circumstances known to counsel at the time do not reveal a sound basis for further inquiry in a particular area, it is not ineffective for the attorney to forgo additional investigation."). On the contrary, counsel presented what he knew about defendant's mental state in support of self-defense: defendant's testimony he was scared for his life and scared of Jackson. We cannot see how counsel's presentation of the self-defenese evidence available to him prejudiced defendant.

¶ 46    For the foregoing reasons, we affirm the summary dismissal of defendant's *pro se* postconviction petition.

¶ 47    Affirmed.

¶ 48    PRESIDING JUSTICE GORDON, dissenting:

¶ 49    The majority finds frivolous and patently without merit defendant's claim that the victim's repeated shooting of defendant in the head only two weeks before—and defendant's resulting post-traumatic stress disorder (PTSD)—adversely affected defendant's subjective judgment on the night of the offense. The majority finds frivolous defendant's claim that the shooting and the PTSD caused defendant to have a subjective and actual belief in the need for immediate defensive action on the night of the offense. We could take judicial notice of the fact that a rational person could interpret being shot in the head as a threat—and a warning about what would happen next time, should defendant survive. The brutal attack and the resulting head trauma were not distant events but rather occurred less than two weeks from the offense and, therefore, had to impact defendant's judgment. For the reasons explained below, I must respectfully dissent.

¶ 50    Defendant testified at trial that, on June 11, 2012, he was shot twice in the head by Hansen Jackson, who subsequently became the victim in the case at bar. Jackson drove by defendant in a motor vehicle and shot defendant twice in the head and once in the leg. After that incident, defendant carried a gun and was scared for his life, which does not appear to be an irrational sentiment. Two weeks later, at 2 a.m. on June 24, 2012, defendant was walking on the street, when he observed Jackson running while holding something in his hands by his waist. Defendant fired at Jackson and ran.

¶ 51    At the close of evidence, the trial court found that there was sufficient evidence to warrant instructing the jury on both self-defense and second-degree murder.

¶ 52    However, other than defendant's testimony, trial counsel presented not a scintilla of supporting evidence for either a self-defense or a second-degree murder finding—not even the hospital records showing that defendant had, in fact, been shot in the head just two weeks before. The records were not offered into evidence. Since defendant admitted to shooting Jackson, defendant's claims of self-defense or second-degree murder were the most significant issues at trial. For second-degree murder, defendant had to show only a subjective, even if unreasonable, belief in the need for self-defense. *People v. Washington*, 2012 IL 110283, ¶ 56.

¶ 53    On this appeal, which is at the first stage, we determine solely whether defendant's *pro se* petition is not frivolous and patently without merit. This is an extremely low standard to meet. Our supreme court has instructed its courts: "Because most petitions are drafted at this stage by defendants with little legal knowledge or training, this court views the threshold for survival as low." *People v. Hodges*, 234 Ill. 2d 1, 9 (2009).

¶ 54    Defendant's petition claims that his trial counsel was ineffective for failing to support his self-defense claims, and defendant attached the hospital records detailing his head wounds. Defendant specifies additional evidence that counsel could have utilized to support his claims, such as an expert witness in PTSD to describe the effect of defendant's recent—gunshot—head wounds on defendant's thinking process. In addition to the hospital records, defendant attaches an affidavit from Markeisha Dockery who avers that, shortly after the offense, she observed a man named Quinton Bobo remove a gun from Jackson's hand and run. This is significant evidence that would support defendant's self-defense claim, because the victim had a gun in his hand at the time of the offense.

¶ 55 The hospital records attached to defendant's petition establish that defendant had a bullet wound to his right forehead that caused "a traumatic subarachnoid hemorrhage." The "missile" was "lodged in the outer cortex of the frontal bone." A day later, defendant was still "dizzy," and surgery was later performed to remove the "specimen." However, some "bullet fragments" still remained. Defendant alleges that his claim relies on both " 'in/outside record(s),' " which appear to refer to documents regarding his time both "in" and out of prison, such as his hospital records and his attempts to obtain his prison mental-health records.

¶ 56 In an affidavit, defendant avers that he submitted a request for his prison medical records that show he still suffers from "Traumatic Post Concussive Brain Disorders," but he had not yet received the requested records. Defendant avers that prison officials informed him that he was on a " 'long list' " of prisoners waiting for copies of their medical records. Defendant avers that his records would establish that he suffers from PTSD, anxiety and depression as a result of the gunshot wound to his head. Defendant's affidavit specifies by name his treating physicians, their diagnoses and prescriptions.

¶ 57 At the first stage, a *pro se* petition alleging ineffective assistance may not be dismissed if it is "arguable" whether counsel's performance fell below an objective standard of reasonableness, prejudicing defendant. *Hodges*, 234 Ill. 2d at 17. "With regard to this requirement, a defendant at the first stage need only present a limited amount of detail in the petition." *Hodges*, 234 Ill. 2d at 9. I believe that defendant, with his multiple affidavits and detailed factual claims, has exceeded this requirement.

¶ 58    The majority rejects defendant's claims, finding that there is "no proof" that defendant's PTSD affected his "mental state at the time of the incident." *Supra* ¶ 40. Frankly, I cannot see how it could not have affected his mental state.

¶ 59    Specifically, the majority finds that defendant's prison diagnosis of PTSD does not establish that defendant had PTSD at the time of the offense. This finding overlooks defendant's allegation—which we must accept as true—that his PTSD began with his head injury, which occurred two weeks *prior* to the offense. Thus, if he had PTSD in prison, and the PTSD began with the trauma of being shot in the head, then he had to have had the PTSD at the time of the offense.

¶ 60    The majority finds that "a defendant's mental health issues" are essentially irrelevant to "any theory of self-defense." *Supra* ¶ 42. However, defendant's subjective belief *is* an issue for second-degree murder; and evidence of a defendant's mental health issues could make a jury more likely to find that defendant held an actual and subjective, although unreasonable, belief in the need for self-defense.

¶ 61    In support of its finding that defendant's failure to attach an affidavit from a medical expert is fatal to his claim, the majority cites the Illinois Supreme Court case of *People v. Dupree*, 2018 IL 122307. S*upra* ¶ 40. Most importantly, *Dupree* was a second-stage case and, thus, distinguishable from the case at bar. *Dupree*, 2018 IL 122307, ¶ 1. The issue in *Dupree* was whether the defendant, with the assistance of counsel, had made a substantial showing of proof that would then necessitate a third-stage evidentiary hearing. *Dupree*, 2018 IL 122307, ¶ 28. As a result, the issue in *Dupree* is analytically very different than the issue before us, which is merely whether defendant's *pro se* petition is frivolous.

¶ 62    Even so, *Dupree* does not support the majority's finding. In *Dupree*, the appellate court found that the petition before it could not advance "because defendant did not attach to his postconviction petition an affidavit from the proposed witness ([name]) and the lack of an affidavit was fatal to his claim of ineffective assistance of counsel." *Dupree*, 2018 IL 122307, ¶ 30. Our supreme court flatly stated: "We disagree." *Dupree*, 2018 IL 122307, ¶ 30.

¶ 63    Even at the second stage, our supreme court found that its precedent did *not* create "a bright-line rule" requiring dismissal of an ineffectiveness claim "simply because no affidavit from the proposed witness was attached." *Dupree*, 2018 IL 122307, ¶ 34. If that was true at the second stage, it is even more true at the first stage.

¶ 64    On the facts before it, the *Dupree* court found that no affidavit from the proposed witness was needed to advance the defendant's ineffectiveness claim. *Dupree*, 2018 IL 122307, ¶ 41. In support of the *Dupree* defendant's factual allegations that a complaining witness had provided conflicting stories, the defendant had attached relevant police reports. *Dupree*, 2018 IL 122307, ¶ 41. Similarly, in the case at bar, to support his factual allegations of recent head trauma, defendant appended his hospital medical records from less than two weeks prior to the offense and his affidavit from after the offense detailing his physicians, their diagnoses and prescriptions and his attempts to obtain their supporting medical records.

¶ 65    To the extent that the majority believes that *Dupree* requires—at the second stage—a supporting medical expert's affidavit, then the case should be remanded to allow for the appointment of counsel in order to obtain one. *Dupree* establishes that dismissing on that basis at the first stage is premature and unwarranted.

¶ 66    The majority finds that defendant's petition did not allege that his counsel was ineffective for failing to support or to prove his self-defense claims. *Supra* ¶ 42. As the majority acknowledges, we must give *pro se* petitions " 'a liberal construction' " at the first stage and review them " 'with a lenient eye, allowing borderline cases to proceed.' " *Supra* ¶ 26. In his *pro se* petition, defendant alleged ineffectiveness by his trial counsel which the petition then broke down into individual "claims." Each claim was an example of evidence or witnesses that counsel could have utilized in support of defendant's self-defense claims—but did not. The clear, overall thrust of his *pro se* petition is counsel's failure to support defendant's self-defense claims. Given the low standard of "frivolous and patently without merit," and "the lenient eye" with which we are required to read *pro se* petitions, I find that defendant has sufficiently alleged counsel's ineffectiveness for failing to support defendant's self-defense claims at trial.

¶ 67    To the extent that the majority finds that defendant failed to allege that his counsel was ineffective for failing to support his claim of unreasonable self-defense with evidence and testimony about his PTSD, defendant's *pro se* petition certainly did that. His *pro se* petition alleges that "he suffered from a 'traumatic brain injury and severe concussion at the time of the offense" but that "[n]one of this was considered by the jury or the court." Defendant alleges that the fault for this omission lay with counsel and that his claim was supported by both "in/outside" records, which appears to be a reference to both the "outside" hospital records from when defendant was shot and the records from when he was "in" prison, which substantiated defendant's continuing trauma. However, even if defendant's claims were limited solely to failing to call a supporting mental-health witness and failing to call Dockery, I would still find that they survive the first stage.

¶ 68    The majority makes the factual finding that "defendant's mental health issues *** were *first* diagnosed after trial" and, thus, counsel could not have been ineffective for failing to raise them during trial. (Emphasis added.) *Supra* ¶ 44. This finding is based on pure speculation and has no place in a first-stage analysis.

¶ 69    Defendant's *pro se* petition and attached documents show that he was shot by the victim on June 11, 2012, that he was arrested on June 24, 2012, on the same day as the instant offense; and that on June 29, 2012, he underwent his first surgery. Defendant alleges that, while he was in Cook County Jail, he underwent "a second surgery to remove bullet fragments du[e] to complications." Trial began on August 25, 2014, over two years after the offense. On September 29, 2014, when the PSI was completed, defendant reported that he suffered from severe migraine headaches, for which he received pain medication, but he denied that further mental health services were warranted.

¶ 70    The record before us is completely devoid of any indication of when defendant was "first" diagnosed with PTSD. We do not have the records from his second surgery or any medical records between his first surgery and the start of trial. As a result, guessing when he was first diagnosed is just that—a guess.

¶ 71    The majority writes: "The only medical records that would reflect defendant's mental health issues are in the custody of Stateville Correctional Center. Thus, it appears defendant was diagnosed *** in prison only *after* he was convicted. We accept this as true." (Emphasis in original.) *Supra* ¶ 44. The majority does not explain how it knows that all of defendant's relevant mental health records are in Stateville, when defendant alleges that he also received extensive treatment while at Cook County Jail. But, even assuming *arguendo* that defendant's Cook County

- 21 -

Jail records followed him to Stateville, the fact that these records are presently lodged in Stateville does not prove that he was first diagnosed there. The present location of the record does not equal the location of the diagnosis.

¶ 72    The majority writes that it accepts its own speculations "as true." *Supra* ¶ 44. However, the only facts that we are supposed to accept as true at this early stage are defendant's own well-pled allegations, read in a generous light. By contrast, the majority is straining to read his allegations in the most narrow light possible.

¶ 73    Even if defendant was first diagnosed after trial—and this is not an assumption we should make based on this record—defendant has alleged that he suffered from a very long list of issues, which, if true, should have been apparent to a reasonable attorney, and included: disordered thinking, "distractibility," disorientation, amnesia, and short-term memory loss—just to name a few that defendant listed. These allegations are enough to survive dismissal at the first stage.

¶ 74    As for Dockery's affidavit, the majority finds that it would not have aided defendant and cites what he would have had to prove to establish self-defense. *Supra* ¶ 31. However, second-degree murder was also an issue at trial. A jury that rejects a defendant's claim of self-defense may still "have believed that defendant had an unreasonable belief in the need for the use of force in self-defense." *Washington*, 2012 IL 110283, ¶ 60. For second-degree murder, a defendant need establish only that he had an actual, subjective belief in the need for self-defense, even if that belief was unreasonable. *Washington*, 2012 IL 110283, ¶¶ 33-34.

¶ 75    In the case at bar, defendant testified that he observed something in Jackson's hands before defendant started firing and that, the last time that defendant had observed something in Jackson's hands, it was a gun and Jackson had shot defendant twice in the head. Defendant testified that, at

the moment of the offense, he believed that Jackson "was going to kill me." Defendant testified: I did shoot Hansen Jackson because I was afraid that he was fixing to take my life because he shot me on June 11th." The majority finds that, because defendant did not wait to observe what Jackson held in his hands, Dockery's proposed testimony that it was, in fact, a gun is not supportive. *Supra* ¶¶ 33-34. I must respectfully disagree. The affidavit from the witness provides evidence that Jackson had a gun. A gun in Jackson's hands would have supported defendant's testimony that he was scared for his life and that his fear was reasonable. At a minimum, it would have corroborated defendant's testimony that Jackson had something in his hands.

¶ 76 The majority finds that Dockery's affidavit was "silent as to what happened before defendant shot Jackson." *Supra* ¶ 37. However, this finding overlooks the fact that the gun, which Dockery observed, was not simply on the victim's person, but in his hand.

¶ 77 The majority finds that Dockery's affidavit was irrelevant because defendant failed to prove a credible threat of force by the victim. *Supra* ¶ 37. A rational juror could find that the victim's act of shooting defendant repeatedly in the head, two weeks before, was a credible threat of force—particularly when coupled with the gun that a witness observed in the victim's hand.

¶ 78 Dockery was listed as a potential witness by the assistant public defender who originally represented defendant. Thus, defendant's trial counsel should have been aware that Dockery was a potential witness. Subsequently, when defendant complained before trial that his counsel had not spoken with any of his witnesses, counsel did not dispute that claim. This exchange suggests a failure to investigate. Although counsel's alleged failure to call Dockery may have been strategic, the State's brief to this court "acknowledges that in *People v. Tate*, the Illinois Supreme Court

observed that the [State's] strategy argument was 'inappropriate' for first stage consideration."[3]

Neither the record nor *Tate* support a finding of frivolity at this stage.

¶ 79    Lastly, the State argues that defendant waived his claim when the trial court at the end of trial asked him if he agreed with counsel's decision not to call further witnesses and he replied in the affirmative. However, that affirmative answer has to be viewed through the lens of the admonishments that the trial court had previously given defendant about the role of counsel. Prior to trial, when defendant indicated dissatisfaction with his counsel for not contacting potential witnesses, the trial court informed defendant that he had control over whether to ask for a jury or a bench trial, whether to testify, whether to ask for a lesser included instruction and whether to appeal—but, "[o]ther than that the decisions are made by your attorney, strategic decisions are made by your attorney." In light of the trial court's prior admonishments to defendant, I do not find the State's waiver argument compelling. See *People v. Smith*, 249 Ill. App. 3d 460, 467 (1993) (strategic decisions regarding witnesses are attributed to counsel not defendant, for purposes of an ineffectiveness claim).

¶ 80    For the foregoing reasons, I must respectfully dissent. I cannot find that defendant's detailed and well-supported petition is frivolous.

---

[3] This is a quote from the State's appellate brief, which cited and quoted *People v. Tate*, 2012 IL 112214, ¶ 22.