# Illinois Official Reports

## Appellate Court

---

**_People v. Horton_, 2021 IL App (1st) 180551**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KRISTOPHER HORTON, Defendant-Appellant. |
| District & No. | First District, First Division<br>No. 1-18-0551 |
| Filed | July 19, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CR-13408; the Hon. Allen F. Murphy, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Douglas R. Hoff, and Rebecca I. Levy, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Jon J. Walters, and Paul E. Wojcicki, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE COGHLAN delivered the judgment of the court, with opinion.<br>Justice Pierce concurred in the judgment and opinion.<br>Justice Hyman dissented, with opinion. |

¶ 1        Defendant Kristopher Horton appeals from the denial of his *pro se* motion for leave to file a second successive postconviction petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)). On appeal, defendant contends that leave to file should have been granted because he presented newly discovered evidence that showed a colorable claim of actual innocence, supported his otherwise uncorroborated claim of self-defense, and would probably change the result on retrial. For the reasons that follow, we affirm.

¶ 2        Following a 2010 jury trial, defendant was convicted of first degree murder and sentenced to 75 years in prison. We affirmed defendant's conviction on direct appeal. *People v. Horton*, 2012 IL App (1st) 101980-U.

¶ 3        On April 23, 2006, defendant was attending a block party in Chicago Heights, Illinois. Defendant and Steven Williams were involved in an altercation that resulted in defendant shooting and killing Williams. Defendant was charged with first degree murder and asserted he shot Williams in self-defense.

¶ 4        Prior to trial, defendant sought to introduce evidence of Williams's violent character based on two prior incidents. In the first, Williams was charged with armed robbery and pled guilty to aggravated battery. In the second, Williams was charged with assault, but the State nol-prossed the case. The trial court ruled that Williams's conviction for aggravated battery would be admitted at trial through the testimony of Aaron Estes, Williams's codefendant in that case, but that the second incident was not indicative of Williams's violent character.

¶ 5        At trial, James Holliday testified that he had prior convictions for unlawful use of a weapon by a felon, delivery of a controlled substance, aggravated discharge of a firearm, and possession of a controlled substance. On the night of April 22, 2006, he gathered with a large group of people on Brookline Street in Chicago Heights. The group included his brother, defendant, Williams, and Dasheena Williams. The group was drinking, dancing, and talking in the street.

¶ 6        Holliday testified that "a little after midnight," defendant's aunt, Fannie May Harris, drove through the crowd toward her house, located four or five houses down the street, "flicking" her lights. As she passed, she ran over Williams's foot. Williams, Holliday, Dasheena, and a few other people headed over to Harris's house.

¶ 7        When they got there, Williams and Harris began arguing. Defendant and his girlfriend, Ebony Boykins, were also there. Defendant "started mentioning things about going to get a gun and he'll be back," and he and Boykins got into a car and left. Holliday and his group returned to the block party.

¶ 8        About 5 to 10 minutes later, Holliday saw defendant and Boykins drive up to Harris's house. They got out of the car and returned to the party on foot. Holliday approached defendant, who "was kind of still angry and saying things like f*** this, f*** that, I'm tired—I'm tired of mother f*** playing games with me and things like that." Holliday tried to calm defendant down, but he pulled a gun out of his pocket, cocked it, and said, "It's serious, you know what I'm saying, I'm for real." Holliday responded, "[I]t ain't worth it, don't do it." He tried to hold defendant back physically, but defendant "shook out of his coat."

¶ 9        Holliday turned away from defendant to talk to Boykins and heard a gunshot. According to Holliday, defendant shot Williams "towards his stomach area." At the time he was shot,

Williams was standing about 12 feet from defendant and was talking on his phone. Williams fell to the ground and said, "You shot me." Defendant yelled, "You still talking, you still talking," and fired about three more shots at Williams. Then defendant lifted the gun, pointed it around, and screamed, "Anybody can get it, anybody can get it." The group in the street scattered. Defendant and Boykins returned to their car and drove away.

¶ 10      Holliday asked Williams if he was "going to make it." Williams shook his head. Holliday went to tell Williams's parents what had happened. Holliday's brother and Daniel Logan put Williams in Logan's truck and drove him to the hospital. Holliday never saw Williams with a gun that night but acknowledged that he had been drinking vodka since about 5 p.m. and taking Ecstasy.

¶ 11      Dasheena testified that at around 5 p.m. she, Williams, and another person went to the block party, where people were drinking, dancing, and walking around. Dasheena had been drinking but was not drunk. After "a while," Harris came "flying down the street" in her car, beeping her horn and flashing her lights, and ran over Williams's foot before pulling into her driveway.

¶ 12      Williams was not badly hurt but started walking to Harris's house with Dasheena, Holliday, and Holliday's brother for an "apology." When they got there, Harris was standing at the window inside her house, and defendant and Boykins were outside. Williams asked Harris why she ran over his foot, and Harris cursed in reply. Williams and defendant began talking. According to Dasheena, Williams was not angry, but defendant was. Defendant "went to go get the gun. [Boykins] was telling him to go get the gun." After defendant and Boykins drove off, Dasheena, Holliday, and Holliday's brother walked back to the party.

¶ 13      About 20 minutes later, defendant and Boykins returned and pulled up outside Harris's house. Dasheena was about 14 feet away from Williams, who was standing in a driveway, talking on his phone. Defendant started walking toward the party. Holliday walked up and began talking to defendant and grabbed his coat. As defendant squirmed out of his coat, Dasheena saw a gun in his hand.

¶ 14      Williams "was still on the phone acting like he didn't see nothing was going on." Defendant "walked up" and shot Williams, who fell to the ground. Defendant shot Williams two more times, waved the gun around, and asked whether anyone else wanted "to get it." The crowd scattered. Defendant walked back to his car and drove off with Boykins. Two men picked Williams up, placed him in a truck, and drove away. Dasheena did not know the "exact time" Harris drove through the crowd but recalled it was "at night."

¶ 15      Logan testified that he arrived at the block party between 10 and 11 p.m., "after *** the initial altercation happened," that is, after Williams's "foot got run over." Logan was standing in a driveway about six feet away from Williams, who was talking on his phone and rolling a marijuana cigarette, when he saw defendant and Boykins walking toward them from the direction of Harris's house. Holliday tried to calm defendant down, but he continued walking toward Williams.

¶ 16      Logan noticed that defendant had a gun. Williams, who was still on the phone, said, "What, you going to shoot me now?" Defendant shot Williams in the stomach, and he fell to the ground. Defendant swung the gun around and said, "Any of you mother f*** can get it." Defendant then shot Williams two more times. Logan went to a neighbor's house, told someone there to call the police, and retrieved his truck. He and three or four others placed

Williams into the truck and drove him to the hospital because it did not look like he "was going to make it."

¶ 17 Logan acknowledged that, when he was first interviewed by the police, he gave a false name because he "had a couple of warrants" for "DUI and a possession." Williams seemed angry on the night in question, but Logan never saw anyone other than defendant with a gun.

¶ 18 Chicago Heights police detective Tom Rogers interviewed defendant on April 27, 2006, at a police department in Minnesota. In a videotaped statement, defendant indicated that

> "[Williams] was still down there talking on his phone and *** he told them like, man, f*** this p*** a*** n*** or some s***, you know what I'm saying. *** I'm like, man, *** I'm tired of this s***. *** So I walk down there and he standing there ***. So I'm like, now what, motherf***. *** All that s*** you're talking and saying s*** now. *** [H]e said something. Then, you know what I'm saying, that's when I shot him."

Defendant added that Williams continued swearing at him after being shot, so he shot him again.

¶ 19 The medical examiner testified that Williams suffered gunshot wounds to his lower abdomen, back, and left buttock. The cause of death was multiple gunshot wounds, and the manner of death was homicide.

¶ 20 Defendant testified that he took his gun with him when he left home the morning of the block party. That evening, there were "pockets" of people all along Brookline Street. Over the course of the night, defendant consumed two Ecstasy pills and drank a bottle of cognac.

¶ 21 At some point during the evening, Harris drove past a group of people that included Williams, Holliday, and Holliday's brother. After she parked in her driveway, Williams, Holliday, and Holliday's brother walked over to her house. Defendant saw Williams shake his finger in Harris's face and approached to ask what was going on. Williams said, "B***, ask your auntie and your b*** what happened." Defendant and Williams argued, and Holliday implored Williams to calm down. Defendant warned Holliday that his group should leave before Harris called the police.

¶ 22 Williams, Holliday, and Holliday's brother headed back down the street. Harris told defendant that Williams was "talking crazy" about his foot. Harris and Boykins went into Harris's house. Defendant drove by himself to a liquor store about six blocks away. At the store, he received a call from Boykins, who sounded nervous and reported that "they" were back at Harris's house. Defendant believed "they" meant Williams, Holliday, and Holliday's brother.

¶ 23 Defendant drove back to Harris's house and parked on the street. He saw Williams, Holliday, and Holliday's brother in the field next to Harris's house. Williams, who was taller and heavier than defendant, was waving his hands. Defendant exited his car and started walking toward Holliday to talk to him. At this point, defendant saw that Williams was holding a gun and shaking it in an up-and-down motion. Williams yelled something to the effect of, "[S]omebody gonna pay for this." Defendant thought Williams was talking about receiving money because Harris ran over his foot. Holliday told Williams to put the gun away, and he placed it in the small of his back.

¶ 24 Defendant, by this time nervous and confused, asked Holliday what was going on. Williams responded, "Somebody gonna pay for this s***" and started walking backwards away from Harris's house. Defendant followed, telling Williams, "If you want some money

- 4 -

motherf***, a motherf*** will give you some money, man." As Williams and defendant continued to exchange expletives, defendant heard Holliday call his name and looked in his direction. When defendant turned back around, Williams was pointing a gun in his face. Defendant ducked, grabbed his own gun from his waistband, and fired it three or four times. Williams fell to the ground.

¶ 25    Defendant ran to his car, drove to a hotel, and eventually took a bus to his uncle's house in Minnesota. A few days later, he and Boykins were arrested in Minnesota. They were placed in separate cells, but defendant could hear Boykins crying. At some point, Detective Rogers told defendant that several witnesses had made statements implicating him in the shooting. Defendant told Rogers his version of the events, but Rogers "told me that was bulls***, and if I don't say what them guys said in their statement, that he was gonna charge [Boykins] with accessory to murder." This "shook" defendant, so he agreed to make a videotaped statement. In exchange, the police promised to let Boykins go.

¶ 26    Following defendant's testimony, defense counsel moved to call Estes as a witness to show Williams's violent character. The State objected. The trial judge ultimately determined that Estes would not be allowed to testify, reversing a prior ruling. The parties stipulated that Williams had a prior conviction for aggravated battery.

¶ 27    In closing, the State asserted that defendant's self-defense claim was a "ridiculous story" and urged the jury to find him guilty of first degree murder. Defense counsel responded that Williams displayed a gun first and defendant reacted to protect himself. In rebuttal, the State argued that defendant's testimony that Williams displayed a gun first was uncorroborated.

¶ 28    The jury found defendant guilty of first degree murder and found that he personally discharged a firearm that proximately caused Williams's death. The trial court subsequently sentenced defendant to a term of 50 years for the murder and a consecutive 25-year term for personally discharging a firearm that proximately caused Williams's death.

¶ 29    In 2013, defendant filed a *pro se* postconviction petition alleging error on the part of the circuit court and ineffective assistance of trial counsel for failing to seek and hold a pretrial fitness hearing. The trial court summarily dismissed the petition, and no appeal was filed.

¶ 30    In 2014, defendant filed a *pro se* motion for leave to file a successive petition, alleging ineffective assistance of trial counsel for failing to move to suppress his inculpatory statement on the ground that it was coerced and ineffective assistance of appellate counsel for failing to raise this claim on direct appeal. The circuit court denied leave to file the successive petition. On appeal, we granted counsel's motion to withdraw and affirmed. *People v. Horton*, No. 1-15-0624 (2016) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 31    On December 18, 2017, defendant filed the instant "Successive Post-Conviction Petition Pursuant to Newly Discovered Evidence Under Actual Innocence," supported by an affidavit from Damien Hyde.

¶ 32    Hyde's November 2, 2017, affidavit asserts that, on the night of the shooting, Williams, the leader of their gang, called him at about 10 p.m. and said to meet him "at the spot where we kept all the guns." About 15 minutes later, Williams arrived at "the spot" with Logan and asked for a specific .45-caliber handgun, which Hyde gave to him. Williams "was very mad and looking crazy." When he left with Logan, he said he was "about to take care of" defendant.

¶ 33    After giving Williams the gun, Hyde left town for two days. When he returned, Logan gave him back the gun. Logan was crying and told Hyde "how they went to kill [defendant], but

[defendant] got the up's on [Williams] and shot and killed [Williams]." Hyde asked Logan how the gun got blood on it. Logan explained that it was Williams's blood and told Hyde "how when [Williams] got shot, he was bleeding real bad and when [Williams] was on the ground [Logan] took the gun off him and how blood was all in his truck from [Williams] too, he told me how he drove [Williams] to the hospital." Hyde further explained that he "really don't like [defendant] because what happen, but the truth is the truth and I gave [Williams] a gun before he approach [defendant] and [Logan] was right there when I did."

¶ 34    On December 27, 2017, the circuit court ruled that the successive petition did not "come close" to establishing a claim of actual innocence and was "gravely lacking," noting Hyde was not present when the shooting happened.

¶ 35    On appeal, defendant argues that his newly discovered evidence presents a colorable claim of actual innocence that supports an otherwise uncorroborated claim of self-defense. He asserts that Hyde's affidavit is newly discovered, material, noncumulative, and so conclusive that it is likely to change the result on retrial. Since three eyewitnesses testified at trial that Williams did not have a gun, defendant argues that Hyde's allegations exonerate him of first degree murder and show "that Williams was in fact armed, thus corroborating [defendant's] long-time claim that Williams pointed a gun at [him] immediately before [he] shot [Williams]," confirming that he shot Williams in self-defense. Alternatively, he argues that the newly discovered evidence supports a conviction of second degree murder, based on an unreasonable belief in the need for self-defense.

¶ 36    According to the State, the "key attestations" in Hyde's affidavit cannot be true because:

"Hyde claims that he gave a livid Williams a gun so he could 'take care of' [defendant] at about 10:15 p.m., some two hours before the dispute between Williams and [defendant] took place. That is, two hours before Williams had any reason to want to 'take care of' [defendant]. Viewed alongside the undisputed evidence establishing when the dispute between Williams and [defendant] arose, Hyde's story that he gave an angry Williams a gun at 10:15 p.m. disintegrates."

¶ 37    In addition, Hyde's conversation with Logan "is equally fantastic," because the "Williams/Harris confrontation," which triggered Williams's dispute with defendant, did not take place until around midnight, that is, two hours after Hyde claimed he met Williams and Logan to hand off the gun.

¶ 38    Further, Logan's alleged statement that defendant "got the up's" on Williams establishes that defendant was the aggressor, and two eyewitnesses besides Logan also testified they did not see Williams with a gun that night. Even assuming *arguendo* that Williams had a gun in his possession, there is no evidence he displayed it before being shot by defendant. Finally, defendant never told the police Williams had a gun.

¶ 39    Defendant responds that the trial evidence regarding the timing of his first encounter with Williams was unclear, not "undisputed." Although Holliday testified the confrontation happened around midnight, he was under the influence of Ecstasy and alcohol. Dasheena did not know what time the altercation occurred. Logan testified that the initial altercation between Williams and defendant had already occurred by the time he got to the block party, between 10 and 11 p.m. Defendant testified that the confrontation occurred late in the evening, but he was also under the influence of Ecstasy and alcohol.

¶ 40   According to defendant, even if Hyde's recollection regarding the time Williams picked up the gun (11 years after the fact) is inaccurate, his affidavit should not be rejected at the leave-to-file stage. Relying on *People v. Robinson*, 2020 IL 123849, ¶ 73, he claims that Hyde's affidavit is not rebutted by the trial record in a manner fatal to the advancement of his petition simply because it contradicts or conflicts with some of the trial evidence. Regarding whether he was the aggressor, defendant argues that a person who believes he is in danger of great bodily harm does not have to wait until he is actually hurt before acting in self-defense and that Hyde's affidavit corroborates his trial testimony and raises the probability of a different outcome at trial.

¶ 41   Our supreme court has provided two bases upon which the bar against successive postconviction proceedings may be relaxed. *People v. Edwards*, 2012 IL 111711, ¶ 22. The first is when a defendant establishes "cause and prejudice" for failing to raise the claim earlier. *Id.* The second is the "fundamental miscarriage of justice" exception, under which the defendant must show actual innocence. *Id.* ¶ 23. When a defendant claims actual innocence, the issue is whether the petition and supporting documentation set forth a colorable claim, that is, whether "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* ¶¶ 24, 31, 33. Evidence supporting a claim of actual innocence must be (1) newly discovered, (2) material and not merely cumulative, and (3) of such conclusive character that it would probably change the result on retrial. *Id.* ¶ 32. The conclusiveness of the evidence is the most important element of an actual innocence claim. *People v. Sanders*, 2016 IL 118123, ¶ 47. We review the denial of leave to file a successive postconviction petition *de novo*. *Robinson*, 2020 IL 123849, ¶ 40.

¶ 42   The State explicitly asserts that "[defendant] has not come forth with newly discovered material evidence of his innocence" and that "[e]vidence that adds to the information that the factfinder heard at trial is noncumulative." We disagree with the dissent that the State concedes that Hyde's affidavit is newly discovered, material, and noncumulative. *Infra* ¶ 59. In any event, "it is well established that we, as a court of review, are not bound by a party's concession." *People v. Carter*, 2015 IL 117709, ¶ 22 (citing *Beacham v. Walker*, 231 Ill. 2d 51, 60-61 (2008)). Moreover, "we may affirm on any basis supported by the record if the judgment is correct." *People v. Anderson*, 401 Ill. App. 3d 134, 138 (2010) (citing *People v. Lee*, 344 Ill. App. 3d 851, 853 (2003)).

¶ 43   Defendant has failed to present noncumulative evidence in support of his claim of actual innocence. "Noncumulative means the evidence adds to what the jury heard." *People v. Coleman*, 2013 IL 113307, ¶ 96. Hyde's claim that he gave Williams a gun prior to the shooting is merely cumulative of defendant's trial testimony that Williams was armed—it does not "add[ ] to what the jury heard." Defendant cannot establish a sufficient claim of actual innocence by alleging the same evidence that was presented to, and rejected by, the jury. See, *e.g.*, *Anderson*, 401 Ill. App. 3d at 141 (finding that defendant failed to establish actual innocence because the evidence was "cumulative of defendant's testimony at trial"). The extent to which "Hyde's affidavit corroborates [defendant's] claim of self-defense" (*infra* ¶ 62) may be a "basis to argue the existence of a reasonable doubt," but that is not the standard for establishing a claim of actual innocence. *Anderson*, 401 Ill. App. 3d at 141; see also *People v. Coleman*, 381 Ill. App. 3d 561, 568 (2008) (noting that "an allegation of newly discovered evidence of innocence is not intended to question the strength of the State's case" (internal quotation marks omitted)).

¶ 44    In addition, defendant's proposed new evidence is not conclusive. The element of conclusiveness contemplates whether the proposed new evidence, when considered along with the trial evidence, would probably lead to a different result on retrial. *Coleman*, 2013 IL 113307, ¶ 96. In *Robinson*, the supreme court clarified that there is no requirement that the new evidence be entirely dispositive or support total vindication or exoneration in order to be likely to alter the result on retrial. *Robinson*, 2020 IL 123849, ¶¶ 48, 55-56. "Rather, the conclusive-character element requires only that the petitioner present evidence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 56. Probability, not certainty, is key in determining whether the fact finder would reach a different result after considering the trial evidence along with the new evidence. *Id.* ¶ 48. Leave to file should be granted where the supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted the defendant in light of the new evidence. *Id.* ¶¶ 44, 50. Prior to third-stage proceedings, all well-pled allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true, and the court is precluded from making factual and credibility determinations. *Id.* ¶¶ 45, 61.

¶ 45    Here, defendant contends that Hyde's affidavit is of such conclusive character that it would probably change the result on retrial. In the affidavit, Hyde indicated that around 10:15 p.m. on the night in question, he met with Williams and Logan. Hyde gave a handgun to Williams, who "was very mad and looking crazy," said he was "about to take care of" defendant, and then left with Logan. According to Hyde, two days later, Logan brought the gun back. At that point, Logan told Hyde that he and Williams had gone to kill defendant but that defendant "got the up's" on Williams and shot and killed him instead. Logan also stated that he removed the gun from Williams's body before driving him to the hospital.

¶ 46    In order to raise a claim of self-defense, a defendant must present evidence that (1) force was threatened against him; (2) he was not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he "actually believed that a danger existed, that the use of force was necessary to avert the danger, and that the kind and amount of force actually used was necessary"; and (6) his beliefs were reasonable. *People v. Morgan*, 187 Ill. 2d 500, 533 (1999). Self-defense and second degree murder differ "only in terms of the nature of defendant's belief at the time of the killing." *People v. Hooker*, 249 Ill. App. 3d 394, 403 (1993). Self-defense may apply if the defendant's belief as to the use of force was reasonable, while a conviction of second degree murder may be appropriate if the defendant's belief was unreasonable. *Id.* Self-defense may serve as the basis for an actual innocence claim because it is "a justifying or exonerating circumstance." (Internal quotation marks omitted.) *People v. Woods*, 2020 IL App (1st) 163031, ¶ 41. In contrast, a claim of second-degree murder does not constitute a claim of actual innocence because "actual innocence" requires that a defendant be free of liability both for the crime of conviction and for any related offenses. *People v. Wingate*, 2015 IL App (5th) 130189, ¶¶ 31-34; see also *People v. Moore*, 2018 IL App (3d) 160271, ¶ 20.

¶ 47    We find that defendant's petition and Hyde's supporting affidavit fail to present a colorable claim of actual innocence based on self-defense. In coming to this conclusion, we are persuaded by two recent unpublished decisions of this court. See Ill. S. Ct. R. 23(e)(1) (eff. Jan. 1, 2021) (nonprecedential appellate court orders entered on or after January 1, 2021, may be cited for persuasive purposes).

¶ 48    In *People v. Jackson*, 2021 IL App (1st) 190406-U, ¶¶ 26-27, 32, 34, the defendant, despite asserting self-defense at trial, was convicted of one count of second degree murder, three counts of attempted first degree murder, and four counts of aggravated discharge of a firearm. He filed a postconviction petition alleging newly discovered evidence of actual innocence. Specifically, the defendant presented an affidavit executed by a witness recanting her trial testimony that neither she nor any of the other occupants of the vehicle at which defendant shot were armed. *Id.* ¶ 35. The witness claimed that, instead, the murder victim " 'had a gun' " in the vehicle and that, after the group arrived at the hospital, another occupant of the vehicle " 'left with [the] gun to get rid of it.' " *Id.* The circuit court summarily dismissed the petition. *Id.* ¶ 36.

¶ 49    On appeal, the defendant asserted that he established a claim of actual innocence because the affidavit showed that he acted in self-defense under the reasonable belief that his life was in danger. *Id.* ¶ 41. This court found that his petition "set forth conclusory allegations that were insufficient to show that he acted reasonably in self-defense and was therefore actually innocent." *Id.* ¶ 45. The allegation that the murder victim " 'had a gun' " when the shooting occurred, with nothing more, failed to show that the "defendant was threatened with force or that he reasonably believed a danger existed" (*id.* ¶ 47) and, therefore, was not " 'of such conclusive character' that it would 'probably change' " the result on retrial (*id.* ¶ 50 (quoting *Edwards*, 2012 IL 111711, ¶ 32)). As such, we determined that summary dismissal was proper. *Id.* Specifically, we recognized in *Jackson* that "Davis's assertion that Lytony had a firearm does not add any facts that the jury had not already heard and was therefore merely cumulative." *Id.* ¶ 49. Similarly, in this case, Hyde's assertion that Williams had a firearm does not add any facts that the jury had not already heard from defendant's testimony and is therefore cumulative. See *supra* ¶ 43.

¶ 50    In *People v. Smith*, 2021 IL App (1st) 181178-U, ¶¶ 3, 16-17, 21, the defendant, who claimed self-defense but was convicted of one count of first degree murder, filed a postconviction petition alleging that his trial counsel was ineffective for failing to investigate and call a particular witness. In an attached affidavit, that witness asserted that she heard gunshots, ran in their direction, saw the victim on the ground with a gun in his hand, and then saw another man take the gun and run away. *Id.* ¶ 21. The circuit court summarily dismissed the petition. *Id.* ¶ 23.

¶ 51    On appeal, the defendant claimed that he had raised an arguable claim that his trial counsel was ineffective for failing to investigate and call the witness, whose testimony he argued would have supported and increased the credibility of his claim of self-defense. *Id.* ¶¶ 24, 30. We acknowledged that the witness's proposed testimony suggested the victim may have had a gun on his person when the defendant shot him and explained why the police did not find a gun near the victim's body. *Id.* ¶ 32. However, because the witness's statements did not establish that the defendant saw a gun or knew the victim was armed and did not establish that the victim threatened imminent force against the defendant before the defendant shot him, the proposed testimony did not "even arguably establish self-defense because she cannot establish the essential elements that unlawful force was threatened against defendant and the danger of harm was imminent." *Id.* Since the witness's testimony could not have established self-defense, we found that there was not a reasonable probability that this evidence would have changed the outcome of the trial and affirmed the summary dismissal of the petition. *Id.* ¶¶ 33, 36-37, 46.

¶ 52     In the instant case, Hyde's affidavit alleges that he gave Williams a gun on the night of the shooting, claims that Williams went to kill defendant, and explains why a gun was not found on Williams's body at the hospital. But Hyde did not witness the shooting and does not allege that Williams ever displayed or threatened to use the gun. As in *Jackson* and *Smith*, we find that Hyde's proposed testimony fails to show the essential elements of self-defense, *i.e.*, that force was threatened against defendant, that defendant was not the aggressor, that the danger of harm was imminent, that the threatened force was unlawful, and that defendant reasonably believed a danger existed and that shooting Williams was necessary to avert that danger. See *Morgan*, 187 Ill. 2d at 533. Therefore, defendant has not "raised the probability that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Robinson*, 2020 IL 123849, ¶ 50.

¶ 53     In *Jackson* and *Smith*, based on evidence similar to the new evidence offered here, we found that the defendants had failed to present claims that were not frivolous and patently without merit. See *Jackson*, 2021 IL App (1st) 190406-U, ¶¶ 39, 50; *Smith*, 2021 IL App (1st) 181178-U, ¶¶ 26, 46. In addition, this case involves a request for leave to file a successive petition, which is reviewed under a higher standard than that applicable to the first stage for an initial petition. *Robinson*, 2020 IL 123849, ¶¶ 43, 58. Here, defendant needed to set forth a colorable claim of actual innocence by showing that his petition and supporting documentation raises "the probability that it is more likely than not that no reasonable juror would have convicted the [defendant] in light of the new evidence." See *id.* ¶¶ 44, 50. For all of the reasons set forth herein, we find that defendant failed to meet this standard. Therefore, the circuit court did not err in denying leave to file defendant's successive postconviction petition.

¶ 54     Accordingly, we affirm the judgment of the circuit court.

¶ 55     Affirmed.

¶ 56     JUSTICE HYMAN, dissenting:

¶ 57     The information in Hyde's affidavit shatters confidence in Horton's guilt.

¶ 58     In my view, the majority misapplies *People v. Robinson*, 2020 IL 123849, putting an exceedingly generous gloss on the State's sole argument in favor of affirmance. I would reverse the denial of leave to file Horton's second successive postconviction petition and so respectfully dissent.

¶ 59     The State, by not challenging the first three elements of an actual innocence claim, concedes that Hyde's affidavit is (i) newly discovered, (ii) material, and (iii) noncumulative. The majority disagrees and refers to two sentences in the State's brief that mention the first three elements. But these sentences occur in the context of a discussion of the standard for an actual innocence claim and make just a passing reference to the first three elements. As such, the sentences are not argument. Indeed, immediately after the State contends Horton "has not come forth with newly discovered material evidence of his innocence," it clarifies its meaning by saying Hyde's affidavit "is not evidence" because it is "untrue."

¶ 60     Contrary to the majority's reading, the State's brief makes no argument on the first three elements (new, noncumulative, and material) of Horton's actual innocence claim. Instead, the State's sole argument insists that the information in Hyde's affidavit would not probably change the result on retrial because it is untrue. The majority then reminds us that a party's

concession does not bind us, yet, all too often, appellate courts have admonished defendants for raising underdeveloped arguments. I could cite scads of illustrative cases for this proposition, but I leave it to three examples. See *People v. Nieves*, 192 Ill. 2d 487, 503 (2000) (defendant's argument waived where it "consists of a single sentence"); *People v. Wendt*, 163 Ill. 2d 346, 356 (1994) (chastising defendant for raising argument in "a single sentence in her brief" without support or authority); *People v. Oglesby*, 2016 IL App (1st) 141477, ¶ 243 n.7 (finding defendant made "no meaningful argument" where claim consisted of one sentence with ambiguous meaning).

¶ 61 While, as the majority also reminds us, we can affirm on any basis supported by the record, this principle does not excuse the State from its minimal burden of developing arguments on which it would have us rely. Certainly, the Illinois Supreme Court rules do not exempt appellees. See Ill. S. Ct. R. 341(h)(7), (i) (eff. Oct. 1, 2020). A fair reading of the State's brief raises one and only one argument: the trial testimony allegedly conflicts with Hyde's affidavit. But the Illinois Supreme Court in *Robinson* held that inconsistency with trial testimony no longer supports denying leave to file a successive postconviction petition based on actual innocence. *Robinson*, 2020 IL 123849, ¶¶ 58-60 (rejecting "conflicting evidence" standard at leave to file stage).

¶ 62 The majority affirms on the basis that "Hyde's proposed testimony fails to show the essential elements of self-defense," relying on the relative materiality of the evidence in Hyde's affidavit. See *id.* ¶ 47 (defining material evidence as evidence "relevant and probative of the petitioner's innocence"). Even if the State had not conceded materiality, the majority's analysis sidelines Horton's trial testimony, in which he explained that he did not shoot Williams until Williams pointed a gun in his face. Hyde's affidavit corroborates that claim of self-defense by confirming both that Williams had procured a gun earlier in the evening and that he intended to shoot Horton. It also, crucially, explains why a gun may not have been found at the scene afterward. Maybe the majority does not believe Horton's trial testimony (and for that matter, maybe the jury did not either), but that is not the question at the leave to file stage. See *id.* ¶ 45 ("court is precluded from making factual and credibility determinations").

¶ 63 The majority's failure to account for Horton's trial testimony leads it to rely on *People v. Smith*, 2021 IL App (1st) 181178-U. There, the defendant's testimony expressly disavowed seeing what the item in the victim's hands might have been before the shooting. *Id.* ¶¶ 16-17, 33. Here, of course, Horton testified that he saw Williams hold a gun directly to his face. Even if *Smith* was not distinguishable, I find the dissent's analysis more persuasive. *Id.* ¶¶ 74-77 (Gordon, P.J., dissenting).

¶ 64 *People v. Jackson*, 2021 IL App (1st) 190406-U, which the majority also cites, differs for similar reasons. There, the defendant's affidavit attached to his postconviction petition stated that one of the victims " 'had a gun' " without claiming the victim had used it or brandished it in any way. *Id.* ¶ 46. Again, we have Horton's trial testimony—disputed—that Williams not only had a gun but pointed it directly in Horton's face. Hyde's affidavit corroborates both Williams's possession of a gun and his intent to use it against Horton that night.

¶ 65 Moreover, the majority proceeds on a theory swept aside by the State. The only reason the State gives to reject the usefulness of Hyde's affidavit amounts to the affidavit not being true. The State perceives Hyde's affidavit as "false" or "demonstrably false," argues it "cannot be true," calls it "fantastic," refers to it as part of a "concoct[ed]" self-defense claim, says it is

"not evidence at all," and describes it as "a collection of false assertions." Compelling facts from the record should support heightened rhetoric like this. Tellingly, the State provides none.

¶ 66    The State primarily takes issue with the timing of the events in Hyde's affidavit. Hyde explained that, at about 10:15 p.m., Williams came to collect the gun, which Horton testified he would later brandish. The State thinks this impossible because some trial witnesses testified that the confrontation leading to Williams's death occurred around midnight. Holliday, one of these witnesses, had been drinking since 5 p.m. on the day of the shooting and, at some point, ingested Ecstasy. One could not fault him for mistaking 10:15 p.m. for midnight. Dasheena, for her part, could not recall the exact time of the events leading to Williams's death, only that it was "at night." Logan initially lied to the police when questioned about the incident. The State presents the timing of the shooting as set in stone, ignoring the record, which shows it malleable based on the memories of those who testified.

¶ 67    The State also points to record evidence that Horton's was the only gun fired. But Horton's self-defense claim was not based on Williams firing first but on Williams pointing a gun in his face. Finally, the State argues that Hyde's affidavit contains information about a conversation with Logan, who explained that Horton "got the ups" on Williams. The State characterizes the statement as evidence that Horton was the aggressor. Of course, it just as plausibly could mean Horton successfully defended himself after Williams pointed a gun at him.

¶ 68    In sum, nothing in Hyde's affidavit is "demonstrably false," as the State claims. Instead, it is disputed. And as our supreme court clarified, discrepancies with the trial record are not enough to reject a claim of actual innocence at the leave to file stage. See *Robinson*, 2020 IL 123849, ¶ 60 ("recognizing the existence of a conflict with the trial evidence is not the same as finding that the new evidence is positively rebutted"). The only basis on which to reject a claim of actual innocence at the leave to file stage is a finding that "no fact finder could *ever* accept the truth of that evidence." (Emphasis added.) *Id.* The State has not made that showing and, having put forward no other basis to affirm, cannot prevail.

¶ 69    We need not be sure that the information in Hyde's affidavit would lead to a different result on retrial. See *id.* ¶ 48 ("[p]robability, rather than certainty, is the key"). The standard of review is similarly relaxed. See *id.* ¶ 58 ("the standard for alleging a colorable claim of actual innocence falls between the first-stage pleading requirement for an initial petition and the second-stage requirement of a substantial showing"). We ask only whether the new evidence "places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 48. Because it does, I would reverse to avoid a potential injustice.