2022 IL App (1st) 210242-U

THIRD DIVISION
September 30, 2022

No. 1-21-0242

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 01 CR 26947 |
| | ) | |
| DEMOND COLE, | ) | Honorable |
| | ) | William G. Gamboney, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Presiding Justice McBride and Justice Gordon concurred in the judgment.

**ORDER**

¶ 1   *Held*:  Reversing the judgment of the circuit court of Cook County denying defendant leave to file a successive postconviction petition and remanding for second-stage proceedings where defendant sufficiently established his actual innocence claim.

¶ 2   Following a jury trial, defendant Demond Cole was convicted of the first-degree murder of Terry Turentine and the attempted first-degree murder of Larry Turentine and was sentenced to a total of 71 years' imprisonment.  The judgment was affirmed on direct appeal, and defendant's initial postconviction petition under the Post-Conviction Hearing Act (the Act) (725 ILCS 5/122-1 *et seq.* (West 2020)) and his federal *habeas corpus* petition were unsuccessful.  In the instant appeal, he challenges an order of the circuit court of Cook County denying his motion

for leave to file a successive postconviction petition under the Act based on a claim of actual innocence. As discussed herein, we reverse and remand for second-stage proceedings.

¶ 3                                     BACKGROUND

¶ 4      Defendant was charged by indictment with first-degree murder, attempted first-degree murder, and aggravated discharge of a firearm. The evidence at trial included the following.

¶ 5                                          *Trial*

¶ 6      Larry Turentine (Larry) testified that on the evening of September 14, 2001, he was riding in the back seat of a blue and gray conversion van owned by his nephew, Terry Turentine (Terry). Terry was driving, and Terry's friend "K.D."[1] was in the front passenger seat. The group decided to visit a woman who resided near 90th Street and Martin Luther King Jr. Drive (King Drive) in Chicago.

¶ 7      Larry testified that as the van traveled southbound on a narrow portion of King Drive near 84th Street, two vehicles were stopped in the street, which blocked traffic. Larry identified defendant as the driver of a maroon Chevrolet Caprice Classic, which faced south; the other vehicle faced north. After a few minutes, Terry blew his horn and asked defendant to leave. According to Larry, defendant turned around, smiled, leaned down in his seat, and continued conversing with the driver of the other stopped vehicle.

¶ 8       Terry again blew his horn after another few minutes. As defendant continued to talk to the other driver, Terry attempted to drive around the vehicles. The vehicle facing north drove off, leaving Terry's van next to defendant's vehicle. Larry testified that the two vehicles traveled southbound, side by side; each time that Terry accelerated, defendant also accelerated. According to Larry, defendant swerved repeatedly to prevent the van from passing. Defendant

---

[1] K.D.'s name is not provided in the record.

2

then slowed down, which caused the van to strike the back of his vehicle. Larry described the impact as a "[n]ormal little bump."

¶ 9     Terry turned left from King Drive on to 87th Street, and defendant's vehicle proceeded through the intersection. As the van traveled east on 87th Street, Larry noticed that defendant was following the van. Terry made a U-turn, at which point he was stopped on 87th Street, facing west. According to Larry, as the vehicle "creeped up" toward their van, he noticed that two individuals were in the vehicle and that the driver (defendant) was holding a firearm.

¶ 10     Larry testified that defendant leaned back and fired several shots into the van. A bullet struck Terry in the head, and he fell over and began bleeding. As defendant drove away, Larry directed K.D. to move to the driver's seat and take them to the hospital. Larry testified that he observed a police vehicle at 67th Street and King Drive. He exited the van and pounded on the back of the police vehicle for assistance, but the officers did not respond. Larry reentered the van, and they drove to Provident Hospital, near 50th Street and King Drive, where Terry died.

¶ 11     Larry testified that he spoke with police officers at the hospital. Approximately three weeks later, Larry identified an individual in a police line up who resembled the shooter; subsequent testimony indicated that this individual was defendant's brother Joseph Cole. Larry identified defendant as the shooter in a second police line up.

¶ 12     On cross-examination, Larry acknowledged that the incident on King Drive occurred at approximately 10:30 p.m., yet he did not arrive at the hospital until approximately 1:30 a.m. Larry testified that he did not call the police during the incident with defendant, and he did not know why Terry made the U-turn on 87th Street. He further testified that no one in the van had a firearm. After K.D. left the hospital on September 15, 2001, Larry never saw him again.

¶ 13     Defense counsel questioned Larry regarding his statements to the police after the

shooting. Larry apparently told the police that the group was driving down 87th Street when defendant pulled beside them, "started talking smack," and commenced shooting. He could not recall whether he told the police about the bumping incident on King Drive.[2]

¶ 14     Felicia O'Neal (O'Neal) testified that she was dating defendant's brother, Joseph Cole (Joseph), in September 2001. At approximately 1:30 a.m. on September 15, 2001, she was watching television in Joseph's room when defendant entered, holding a firearm. Defendant placed the firearm under the mattress in his bedroom, which was connected to Joseph's room.

¶ 15     O'Neal testified that defendant stated he was in a vehicle accident. Joseph and O'Neal went outside to examine the vehicle, which Joseph owned. The vehicle had a dent on the driver's side and a hole in the back window. Defendant laughed as he twice stated, "I smoked the mother f***." O'Neal understood this to mean that defendant killed someone. Defendant then stated that he needed to leave. A few hours later, O'Neal observed someone remove the firearm from underneath the mattress; she could not recall the identity of the individual.

¶ 16     The State next called Ezra Washington (Washington), who testified that he went for a ride in the Caprice with defendant – Washington's friend – on September 14, 2001. At some point, Washington fell asleep in the passenger seat and later awoke to a "commotion." Defendant was telling the occupants of a van to "go around because they was trippin'[.]" Washington acknowledged that defendant was talking to another driver but suggested the vehicle was not blocking traffic.

¶ 17     Washington testified that defendant pulled off "pretty fast," as the situation was scary. The driver of the van continued to honk the horn and flash the lights. Washington testified that

---

[2] In stipulations presented to the jury, an officer and a detective from the Chicago Police Department each stated that Larry did not mention the bumping incident on King Drive during conversations on September 15, 2001.

the van then sped up and bumped defendant's vehicle. According to Washington, the bump pushed the vehicle off the road, narrowly missing a light pole and a newsstand. At that point, Washington did not observe anyone in the van holding a weapon.

¶ 18     Washington testified that defendant was scared and "panicky." He backed up the vehicle from the sidewalk and drove eastbound on 87th Street toward home. Defendant and Washington then observed the van making a U-turn on the street. As the van approached, they noticed that the driver was pointing a firearm outside of the window of the van. Defendant and Washington ducked, and defendant apparently reached under his seat for a weapon and commenced shooting. Washington testified that the back window of defendant's vehicle "got shot out," and defendant drove off. Washington did not report the incident to the police.

¶ 19     The following month, Washington and defendant were each taken into custody. The State questioned Washington regarding his conversation with multiple detectives and assistant State's attorneys (ASAs). For the first 24 hours, Washington apparently revealed nothing about the incident to law enforcement. When he finally spoke regarding the incident, Washington did not mention that the individuals in the van possessed a firearm or that he and defendant had been fearful. At trial, Washington testified that the detectives and ASAs were threatening to send him to jail so he "spiced up" his handwritten statement. Among other things, the statement provided: "[Washington] states that [defendant] told Joseph that he had shot some guy because the guy had hit his car." Washington was also questioned during trial regarding his grand jury testimony, wherein he testified, in part, that defendant had bragged about the shooting.

¶ 20     During cross-examination, Washington confirmed that he had been in custody from October 13, 2001, until his grand jury testimony on October 16, 2001, at which point he was permitted to return home. Washington testified that he attempted to tell the police about the

firearm that he and defendant had observed in the van, but he was told "we're gonna hold you [in custody]." The information regarding the weapon in the van was not included in his statement.

¶ 21    A detective and multiple ASAs testified for the State. They denied any efforts to influence or dictate the contents of Washington's statement. The defense called no witnesses, and the jury convicted defendant of first-degree murder and attempted first-degree murder.

¶ 22                         *Posttrial Motions*

¶ 23    Three separate motions for a new trial were filed – by defendant's trial counsel Mark Kusatzky, by his newly-retained counsel, and by defendant *pro se*. The latter two motions were premised, in part, on alleged ineffective assistance by Kusatzky for failing to present evidence to corroborate a self-defense theory.

¶ 24    During an evidentiary hearing, defendant's brother Joseph testified that he had been arrested in connection with the shooting before defendant was arrested. Joseph allegedly told Kusatzky that his signed statement and his grand jury testimony implicating defendant were false; Joseph thought he would be called to testify at trial, but he was not. Defendant's brother Martinez Cole, his mother Ramona Cole, and the mother of his children, Melony Williams, testified that O'Neal told them that her statement to police that implicated defendant was false. Defendant testified that the interior and exterior of the Caprice were damaged by gunfire from the van and from the inside by shots he fired in self-defense.[3] Kusatzky testified as a witness for the State that for the first few months of the representation, defendant denied being present at the crime scene. According to Kusatzky, the possibility of a self-defense theory did not emerge until he interviewed Washington. Kusatzky denied that defendant provided any information regarding any damage (or repairs) to the Caprice which would have corroborated a self-defense theory.

---

[3] The Caprice was impounded by the police after defendant's arrest and subsequently destroyed.

¶ 25    The circuit court denied defendant's motion for a new trial and sentenced him to an aggregate term of 71 years in prison.  His motion to reconsider sentence was denied.

¶ 26                    *Direct Appeal and Collateral Proceedings*

¶ 27    In his direct appeal, defendant argued: (1) prosecutorial misconduct; (2) a conflict of interest of counsel; (3) ineffective assistance of counsel; (4) an improper amendment of one of the counts against him; and (5) an error on the mittimus.  The appellate court ordered a correction of the mittimus but otherwise affirmed the judgment of the circuit court.  *People v. Cole*, 1-04-3133 (2006) (unpublished order under Supreme Court Rule 23).

¶ 28    Defendant filed an initial petition for postconviction relief under the Act in October 2007.  Defendant – through his postconviction counsel – filed a motion to withdraw the initial petition and to file an amended petition, wherein he alleged ineffective assistance of trial and appellate counsel.  The claim with respect to appellate counsel was subsequently abandoned.

¶ 29    Defendant alleged that trial counsel's performance was ineffective where he failed to investigate and call certain individuals to testify, including James Wheeler (Wheeler).  Defendant supported these claims with signed affidavits from Wheeler and others.  Defendant subsequently amended his petition with two additional affidavits, including one from Samaj Jones (Jones).

¶ 30    In his affidavit dated September 27, 2007, Wheeler averred that he was a childhood friend of Terry and Larry (the Turentines); Wheeler spoke with defendant when they were both in prison.  According to Wheeler, the Turentines had asked him for handguns a few days before the shooting.  Terry told Wheeler that he hated defendant – "he thinks that he is on something with his lil chain and music blasting."  Terry also told Wheeler that defendant's mother's residence on 90th Street and Ellis Avenue may contain "hundreds of thousands of dollars."  Larry then stated, "just be patient we can get the n*** [whenever] we feel like it, he doesn't even

know that we been watching him." On the day of the shooting, Wheeler observed the Turentines with two black revolvers. At approximately midnight, he observed Larry exiting a van driven by Terry's friend at 68th and May Street, covered in blood and carrying two handguns, which he intended to dispose in the garbage can. Larry reentered the van to transport Terry to the hospital.

¶ 31    In his affidavit dated March 15, 2008, Jones averred that he observed a dark colored van on 87th Street near King Drive as he exited the "Rib Joint." According to Jones, the driver of the van was resting his arm on the window, pointing a black handgun. As soon as Jones noticed the weapon, he observed flashes and heard shots. Jones and his girlfriend ducked, and he heard a loud crash and more shots. Jones did not come forward in 2001 when he was 16 years old, but he had recently received a flyer with defendant's information and decided to contact him.

¶ 32    The petition reached second-stage proceedings, and the State filed a motion to dismiss. In an order entered on July 16, 2009, the circuit court granted the State's motion. The circuit court noted that "petitioner contends that four witnesses who would testify that petitioner acted in self-defense, assuming their testimony was believed by the jury, creates a reasonable probability of a different outcome." The circuit court found, however, that defendant failed to allege facts sufficient to demonstrate that his trial counsel's failures amounted to ineffective assistance of counsel. Among other things, the circuit court stated that trial counsel "cannot be held ineffective for not calling witnesses that he did not know about."

¶ 33    Defendant appealed the dismissal of his postconviction petition, arguing that his postconviction counsel, by not raising a claim of newly-discovered evidence of actual innocence, failed to provide reasonable assistance and failed to comply with the requirement of Supreme Court Rule 651(c) (eff. Dec. 1, 1984) that counsel make any amendment to the petition necessary to adequately present a petitioner's claims. The judgment was affirmed on appeal. See *People v.*

*Cole*, 1-09-2108 (2011) (unpublished order under Supreme Court Rule 23) (finding that defendant raised an improper freestanding claim of unreasonable assistance and Rule 651 did not apply to a petition prepared by counsel). Defendant subsequently filed a *pro se habeas corpus* petition in the federal district court, which was denied. *United States ex rel. Cole v. Hardy*, 2013 WL 2319008 (N.D. Ill. May 28, 2013).

¶ 34　　　　　　*Motion for Leave to File Successive Postconviction Petition*

¶ 35　On June 15, 2020, defendant filed a *pro se* motion for leave to file a successive postconviction petition claiming actual innocence based on newly discovered evidence. Defendant appended the affidavit of Jamaal Smith (Smith), dated June 21, 2019.

¶ 36　Smith averred that while driving south on King Drive on September 14, 2001, he was behind a blue and gray van which was swerving and ramming the rear and driver side of a maroon two-door "Chevy." The van resembled one from his neighborhood driven by Larry, and the Chevy resembled one driven by defendant. Smith is not a friend of Larry or defendant. While the van was swerving, Smith observed the back passenger pointing a firearm out of the sliding door toward the Chevy, and then the van rammed the Chevy onto the curb, causing significant damage. As Smith drove past the Chevy, he recognized defendant as the driver.

¶ 37　Smith further averred that he drove past the van as it was in the left turn lane. Although Smith was scared, he looked into the van and observed Larry pointing a firearm out of the sliding door and K.D. pointing a firearm out of the front passenger window. Smith felt "lucky" that the occupants of the van did not assume his vehicle was defendant's vehicle as Smith drove by. The next evening, Larry and K.D. pulled in front of Smith's mother's residence. Larry threatened Smith: "[K]eep yo' mouth shut and mind yo' business about last night, don't get yo' ass killed for getting in our business." Larry and K.D. drove away, and Smith never saw them again.

¶ 38     Smith averred that he subsequently moved out of town. A few people from the neighborhood informed him that defendant was arrested for Terry's murder. Smith expressed surprise that defendant was arrested for the murder when Larry and K.D. pointed firearms and rammed his vehicle. Smith believed his life and defendant's life had been in danger.

¶ 39     While visiting family, Smith had observed flyers posted around the neighborhood seeking information regarding the incident. Smith also recently read a Facebook post requesting information. As he was young and feared for his and his family's safety, Smith had not previously come forward. Smith indicated that he no longer feared any threats.

¶ 40     Defendant also raised an actual innocence claim based on the affidavits of Wheeler and Jones that were attached to his initial petition.[4] As his postconviction counsel presented a meritless claim of ineffective assistance of counsel for failing to discover these witnesses, defendant contended that his actual innocence claim was never substantively considered.

¶ 41     On January 22, 2021, the circuit court denied defendant's motion for leave to file a successive petition. The circuit court found that the three affidavits – from Smith, Wheeler, and Jones – shared the same salient allegation, *i.e.*, "that one or both of the Turentines pointed guns at [defendant] from their van prior to the shooting," which could lend support to the claim that defendant shot at the van in self-defense. The circuit court noted, however, that "Washington testified at trial that someone pointed a gun in Cole's direction from the Turentines' van." The circuit court concluded that the affidavits were cumulative of Washington's testimony and could not support a colorable claim of actual innocence. Defendant filed this timely appeal.

---

[4] Defendant raised additional arguments, *e.g.,* an alleged *Brady* violation (*Brady v. Maryland*, 373 U.S. 83 (1963)). As noted herein, the circuit court denied the motion for leave to file a successive postconviction petition. Defendant does not advance any arguments regarding these issues on appeal. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (noting that points not argued are forfeited).

¶ 42                                    ANALYSIS

¶ 43    Defendant contends on appeal that he presented a colorable claim of actual innocence based on Smith's affidavit, as well as the previously filed affidavits of Wheeler and Jones. The State argues that the circuit court properly denied leave to file the successive postconviction petition. As discussed below, we accept defendant's contentions regarding the Smith affidavit and thus need not consider the parties' respective contentions regarding the Wheeler and Jones affidavits.

¶ 44    The Act "provides a statutory remedy to criminal defendants who claim that substantial violations of their constitutional rights occurred at trial." *People v. Taliani*, 2021 IL 125891, ¶ 53. As a postconviction petition is a collateral attack on the judgment (*People v. Woods*, 2020 IL App (1st) 163031, ¶ 38), issues that were raised and decided on direct appeal are barred from consideration by the doctrine of *res judicata*, while issues that could have been raised, but were not, are forfeited. *Taliani*, 2021 IL 125891, ¶ 53. See also 725 ILCS 5/122-3 (West 2020) (noting that "[a]ny claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived").

¶ 45    In a noncapital case, a postconviction petition has three stages. At the first stage, the circuit court may summarily dismiss a postconviction petition within 90 days of filing if it "determines the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2020). "At the second stage, counsel can be retained or appointed, and defendant must show that his petition makes a substantial showing of a constitutional violation." *People v. Coats*, 2021 IL App (1st) 181731, ¶ 24. The State can participate and either answer the petition or move to dismiss. *Id.* At the third stage, the circuit court conducts an evidentiary hearing and determines whether the defendant is entitled to relief. *Id.*

¶ 46    The Act contemplates the filing of one postconviction petition. *Woods*, 2020 IL App (1st) 163031, ¶ 39. "Therefore, successive petitions are generally disfavored by the courts, and defendant must obtain leave of court to file a successive postconviction petition." *Id.* See also *People v. Nichols*, 2021 IL App (2d) 190659, ¶ 15 (noting that successive petitions may be filed if the defendant first obtains leave of court). As successive petitions impede the finality of criminal litigation, the rules barring successive petitions will be relaxed only when fundamental fairness so requires. *Taliani*, 2021 IL 125891, ¶ 54.

¶ 47    "In Illinois, we have recognized only two exceptions where 'fundamental fairness' compels the bar against successive petitions to be lifted." *Id.* (quoting *People v. Coleman*, 2013 IL 113307, ¶ 83). The first exception is the "cause and prejudice" exception, which has been codified in the Act. See 725 ILCS 5/122-1(f) (providing that "[l]eave of court may be granted only if a petitioner demonstrates cause for his or her failure to bring the claim in his or her initial post-conviction proceedings and prejudice results from that failure"). The second exception is the "fundamental miscarriage of justice" exception, which requires the petitioner to make a persuasive showing of "actual innocence." *Taliani*, 2021 IL 125891, ¶ 55.

¶ 48    Where a defendant raises an actual innocence claim in a successive postconviction petition, the circuit court should deny leave only where, as a matter of law, no colorable claim of actual innocence has been presented. *Id.* ¶ 52. "Accordingly, leave of court should be granted where the petitioner's supporting documentation raises the probability that it is more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence." *People v. Robinson*, 2020 IL 123849, ¶ 44; *Woods*, 2020 IL App (1st) 163031, ¶ 40. As this is a legal question, we review the circuit court's denial of defendant's motion for leave to file his successive postconviction petition *de novo*. *Taliani*, 2021 IL 125891, ¶ 52. Accord *Robinson*,

2020 IL 123849, ¶ 40. "*De novo* consideration means that we perform the same analysis that a trial judge would perform." *People v. Knight*, 2020 IL App (1st) 170550, ¶ 37.

¶ 49 In the instant case, defendant argues self-defense. In order to raise a claim of self-defense, a defendant must present evidence that (1) force was threatened against him; (2) he was not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he actually believed a danger existed, that the use of force was necessary to avert the danger, and that the amount and kind of force actually used was necessary; and (6) his beliefs were reasonable. *People v. Horton*, 2021 IL App (1st) 180551, ¶ 46. As self-defense is a "justifying or exonerating circumstance," it may serve as the basis for defendant's claim of actual innocence. *Id.*; *Woods*, 2020 IL App (1st) 163031, ¶ 41.

¶ 50 As a procedural matter, a defendant who claims actual innocence in a successive postconviction petition must initially obtain leave of court to file the petition. Substantively, however, a defendant need not show cause and prejudice but "must support his claim of actual innocence with evidence that is 'newly discovered, material and not merely cumulative, and of such conclusive character that it would probably change the result on retrial.' " *Taliani*, 2021 IL 125891, ¶ 58 (quoting *People v. Ortiz*, 235 Ill. 2d 319, 330 (2009)).

¶ 51 We now turn to the Smith affidavit. The affidavit was newly discovered as it was received after trial and defendant could not have discovered it earlier through the exercise of due diligence. *Robinson*, 2020 IL 123849, ¶ 47. Smith averred that he did not come forward sooner since he feared for his safety and the safety of his family. See *People v. Adams*, 2013 IL App (1st) 111081, ¶ 33. Evidence is material if it is probative of a question before the trier of fact. *People v. Willingham*, 2020 IL App (1st) 162250, ¶ 24. Smith's affidavit was material as it contradicted the State's evidence that no one in the van was armed and thus spoke directly to

defendant's self-defense claim.

¶ 52    The next issue is whether Smith's affidavit was noncumulative. "Noncumulative means the evidence adds to what the jury heard." *Coleman*, 2013 IL 113307, ¶ 96. A defendant "cannot establish a sufficient claim of actual innocence by alleging the same evidence that was presented to, and rejected by, the jury." *Horton*, 2021 IL App (1st) 180551, ¶ 43.

¶ 53    We find that Smith's statements were not merely cumulative to the testimony presented at trial. Although Washington's testimony indicated that he observed someone in the van with a firearm on 87th Street, Smith averred that a passenger pointed a firearm at defendant's vehicle while both vehicles were on King Drive. Moreover, Smith averred that Larry and K.D. came to Smith's mother's residence on the day after the shooting and threatened him. Washington's testimony did not reference any such threats. "Evidence is considered cumulative when it adds nothing to what was already before the jury." *Coats*, 2021 IL App (1st) 181731, ¶ 34. Here, Smith provided a first-person account of the incident that directly contradicted Larry's testimony that no occupants of the van were armed. See *Woods*, 2020 IL App (1st) 163031, ¶ 51. The foregoing is sufficient to satisfy the requirement that the evidence be noncumulative, as it adds to the information that was presented to the jury and raises additional questions concerning the verdict. *Id.*

¶ 54    The final requirement for an actual innocence claim is that the new evidence is of such conclusive character that it would probably change the result on retrial. *Willingham*, 2020 IL App (1st) 162250, ¶ 24. "The conclusiveness of the evidence is the most important element of an actual innocence claim." *Horton*, 2021 IL App (1st) 180551, ¶ 41. As our supreme court has stated, "the conclusive-character element requires only that the petitioner presents evidence that places the trial evidence in a different light and undermines the court's confidence in the

judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 56. "The new evidence need not be entirely dispositive to be likely to alter the result on retrial." *Id.* ¶ 48. Probability, not certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence together with the new evidence. *Id.*

¶ 55    The jury in the instant case was presented with two dramatically different versions of the events in question. Smith's testimony would support the defense and contradict the testimony of Larry Turentine, the prosecution's key witness. Assuming the truth of Smith's averments, Larry pointed a firearm at defendant's vehicle shortly before the fatal shooting of Terry. In sharp contrast to Larry, Smith had no obvious incentive to testify in favor of one side or another.

¶ 56    "We are mindful that, at this stage, we take as true all well-pleaded factual allegations in the petition and supporting documents unless they are positively rebutted by the record." *Woods*, 2020 IL App (1st) 163031, ¶ 53. The new evidence presented in the Smith affidavit raises the probability that the jury would find defendant acted in self-defense. Having determined that defendant's petition and Smith's affidavit present a colorable claim of actual innocence, we need not resolve the questions regarding the viability of the previously filed affidavits of Wheeler and Jones.

¶ 57                                   CONCLUSION

¶ 58    For the foregoing reasons, we conclude that the circuit court erred in denying defendant leave to file a successive postconviction petition based on a claim of actual innocence. We thus reverse the judgment of the circuit court and remand for the appointment of postconviction counsel and second-stage proceedings.

¶ 59    Reversed; remanded with directions.